**INTERNATIONAL PAPER COMPANY and Consolidated Subsidiaries,** Plaintiff,

v.

**The UNITED STATES, Defendant.**

**No. 90–119T.**

United States Court of Federal Claims.

April 27, 1995.

**386**

Dennis P. Bedell, Washington, DC, for plaintiff.

William C. Rapp, Washington, DC, with whom was Asst. Atty. Gen., Loretta C. Argrett, for defendant.

## OPINION

REGINALD W. GIBSON, Judge.

### INTRODUCTION

In this tax refund case, International Paper Company and its consolidated subsidiaries (plaintiff or IP) seek a refund of federal corporate income taxes in the total amount of $26.3 million, assessed by defendant for the years 1972 through 1979.[1] Asserting that they are entitled to judgment as a matter of law pursuant to RCFC 56(b), the parties have each filed a motion for partial summary judgment with respect to three (3) distinct substantive issues.[2] In support thereof, the parties assert that no material facts are in dispute and, accordingly, they filed a document entitled "Joint Stipulations Of Fact, Set 1," on October 13, 1992 (hereinafter referred to as "Jt. Stip."). This court will grant summary judgment only where there is no dispute over a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Lane Bryant, Inc. v. United States*, 35 F.3d 1570, 1574 (Fed.Cir.1994). Accordingly, each party claims that it is entitled to judgment, as a matter of law, respecting the following three issues:

(1) Whether plaintiff may recognize and report for federal income tax purposes an amount of $739,375 as part of the purchase price plaintiff received for the sale of its stock in a wholly-owned subsidiary where: (i) the agreement labelled the amount as "interest;" (ii) the "interest" was calculated as a percentage of a stated sum over time; (iii) the "interest" and the stated sum were identified by the agreement collectively as the "Purchase Price;" and (iv) such "interest" was due only upon the satisfaction of certain conditions and upon the transfer of the stock for cash on the "Closing Date"?

(2) Whether plaintiff, as an integrated forest products company, must include "forest management expenses" incurred in the cultivation and management of its standing timber in the calculation of total "combined taxable income" earned between itself and its DISC subsidiary where: (i) plaintiff operates two (2) primary businesses, *i.e.*, the growing and managing of timber and the manufacturing of paper and other wood products; (ii) plaintiff elected to treat the cutting of its

---

1. This represents a decrease from the $33.8 million originally claimed by plaintiff in its complaint filed on February 6, 1990. *See* plaintiff's motion and brief (Pl.Br.) filed October 3, 1991.

2. The complaint raises a total of nine (9) separate substantive refund issues. Therefore, six (6) of said total remain for disposition by a trial on the merits due to the existence of genuine issues of material fact.

timber as a sale or exchange pursuant to § 631(a); (iii) plaintiff took federal income tax deductions for its forest management expenses as § 162 ordinary and necessary expenses; and (iv) plaintiff manufactured the finished wood products exported by the DISC? And

(3) Whether the consolidated federal income tax return regulations require the recharacterization, as ordinary income, of a parent corporation's federal taxable income that is otherwise recognized and reported as long-term capital gains where: (i) the parent corporation granted cutting rights to a wholly-owned subsidiary to cut and haul timber from its property and recognized capital gains pursuant to § 631(b); (ii) the subsidiary simultaneously subcontracted with third parties to cut and haul the parent's standing timber and received payment from third parties for the timber; (iii) officers and employees of the parent corporation served as officers and employees of the subsidiary; (iv) the parent retained legal title in the timber until it was cut and scaled; (v) the compensation paid by the subsidiary pursuant to its contracts with the parent was the same amount the subsidiary received under its separate contracts through which it disposed of the timber; (vi) neither the parent nor the subsidiary claimed a depletion deduction with respect to the timber; and (vii) the subsidiary did not have an "economic interest" in said timber inasmuch as it did not independently possess the power to dispose of same on the open market?

Both parties assert that the issues presented are capable of resolution by this court independently of each other. This court agrees. In light of this fact, the following discussion is organized in three sections, each containing facts and legal argument corresponding to the individual issues under re-view and designated as follows: (1) the Contract Purchase Price Issue; (2) the DISC Issue; and (3) the Consolidated Return Issue. The facts explicated herein are as mutually agreed and jointly stipulated by the parties. Given these three (3) legal issues, we conclude that plaintiff is entitled to summary judgment as to each. We shall address each issue seriatim.

## CROSS–MOTIONS FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Plaintiff is a New York corporation engaged in two primary businesses as previously noted: (i) growing and managing timber; and (ii) manufacturing paper and other wood products. During the years 1972 through 1979, the former business operation generated gross income for IP through Internal Revenue Code (I.R.C.) § 631(a) elections by treating the cutting of timber as a sale or exchange, and § 631(b) dispositions of timber with a retained economic interest.[3] IP earned gross income from the latter business during the years in issue through domestic and export sales of its paper and wood products. Defendant, the United States, on behalf of the Internal Revenue Service (IRS), assessed additional federal corporate income tax for the years 1972 through 1979, which is now disputed by IP. Therefore, on June 21, 1989, IP timely filed an administrative claim for refund of tax and interest respecting the foregoing tax years, which the government denied in full on January 10, 1990. Subsequently, on February 6, 1990, IP filed its complaint in this court.[4]

### II. CONTRACT PURCHASE PRICE ISSUE

#### A. Facts

On March 1, 1979, IP entered into a Stock Purchase Agreement (Agreement) with SWF

---

**3.** All references to the Internal Revenue Code (I.R.C.) are to the Internal Revenue Code of 1954, 26 U.S.C., as amended and in effect during the years 1972 through 1979. All section references made herein, *i.e.*, with a § symbol or otherwise, are to this Code unless otherwise designated as a Treasury Regulation (Treas.Reg.). Relevant sections of the I.R.C. and Treas.Regs. that are not set out in the following text are reproduced in the Statutory Appendix.

**4.** It is by now axiomatic that the Commissioner's determinations are presumptively correct and the plaintiff bears the heavy burden of showing error. *Transamerica Corp. v. United States*, 902 F.2d 1540, 1543 (Fed.Cir.1990) (citing *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933)); *Eckstein v. United States*, 196 Ct.Cl. 644, 452 F.2d 1036, 1051 (1971) (*per curiam*).

Gulf Coast, Inc. (SWF) for the sale of the outstanding stock of Atlanta & Saint Andrews Bay Railway Co. (Bay Line) for cash. The sale was to occur on August 1, 1979, subject to extension, which was designated by the parties as the "Closing Date." This date was subject to delay based on the actual date on which the Interstate Commerce Commission (ICC) granted approval and authorization of the stock purchase (hereinafter referred to as "actual closing date"). Such approval and authorization was required by the ICC because the purchaser of the stock, SWF, was the wholly-owned subsidiary of Southwest Forest Industries, Inc., a company which already controlled another railroad company.

The Agreement between IP and SWF defined the cash payment terms for the stock transfer as follows:

> As payment for the transfer of the Shares by IP to SWF, SWF shall deliver to IP on the Closing Date in immediately available New York funds the sum of $13,000,000 and *SWF agrees to pay interest on said sum at the rate of 10-½% per annum from the date hereof to the Closing Date* (said purchase price and the interest payable thereon by SWF as aforesaid being hereinafter collectively called the "Purchase Price.")

Jt. Stip. ¶ 15 (emphasis added). If a variety of conditions were not fulfilled prior to the Closing Date, both purchaser and seller, SWF and IP, respectively, had the unilateral option to terminate the Agreement. If either party terminated the Agreement in accordance with its terms, IP would not be entitled to any part of the "purchase price" as stated above. The terms of the Agreement restricted the rights of the seller, IP, in a variety of ways with respect to the Bay Line stock *prior* to the actual Closing Date. In addition, the Agreement required IP to affirmatively obtain SWF's written approval before allowing Bay Line to pay, or obligate itself to pay, any amount in excess of $10,000. Finally, IP bore the "entire risk of loss by fire or other casualty to the properties of

Bay Line ... prior to the Closing Date." Jt. Stip. ¶ 29.

The closing of the sale between IP and SWF occurred on September 12, 1979, shortly after the ICC approved the stock transfer on August 28, 1979.[5] At that time, IP exchanged all of the outstanding and issued stock in Bay Line to SWF for the "Purchase Price," *i.e.*, $13,000,000 plus $739,375. This latter sum was calculated at a rate of 10.5% per annum from March 1, 1979 through September 11, 1979. SWF's payment was acknowledged by a "Receipt" executed by IP and dated September 12, 1979, which stated:

> Reference is made to that certain Stock Purchase Agreement dated as of March 1, * * *. IP hereby acknowledges receipt from SWF of $13,739,375 in immediately available funds at New York, New York, constituting the full amount of the *Purchase Price* payable under the Agreement computed as follows:
>
> | | |
> |---|---:|
> | Stated Price | $13,000,000 |
> | Accrued Interest (10.5% per annum from | |
> | March 1, 1979 through September 11, 1979) | $ 739,375 |
> | Total | $ 13,739,375. |

Jt. Stip. ¶ 21 (emphasis added).

On its federal income tax return for the taxable year 1979, IP recognized and reported the entire sum of $13,739,375 as the amount realized on the sale of its Bay Line stock. Consequently, IP reported long-term capital gain on the sale of the Bay Line stock pursuant to §§ 1001, 1221, and 1222. Upon an audit of IP's 1979 federal income tax return, the IRS determined that the sum of $739,375 designated as "interest" in the parties' agreement should be recognized and reported by IP *as interest income* earned, taxable as ordinary income. Defendant justified this adjustment to IP's income tax return on the basis that the buyer, SWF, claimed an interest *deduction* in its federal income tax return with respect to its payment of the $739,375 portion of the purchase price. In its complaint, IP argues that this

5. *See* Jt. Stip. Preamble and Appendix: Stock Purchase Agreement, p. 16, Article 10 ("The Closing Date shall be extended until 30 days following the date of receipt of all approvals, [etc.] ... satisfactory to SWF....").

adjustment to its return was in error, asserting that the $739,375 is not interest, but rather represents part of the stock purchase price.

### B. Contentions of the Parties
#### 1. Defendant

Defendant argues, against this factual background, that the parties are bound by the tax consequences of their contractual arrangement, whether it was anticipated and intended or not. Defendant further contends that it should be presumed that the parties intended the sum of $739,375 to represent interest, deductible by the buyer as an interest expense and ordinary income earned by the seller, simply based on their plain use of the term "interest" in their agreement. Defendant asserts that in this case, if this plain term is reconstrued according to IP's interpretation, it works an injustice against the buyer who presumably negotiated a specific bargain that included an interest deduction which the buyer should not be denied *ex post facto*. Thus, defendant contends that the parties should be unilaterally bound by their negotiated terms.

In addition, defendant avers that IP and SWF fully obligated themselves to the sale of the Bay Line Stock on March 1, 1979, when they executed their agreement and, therefore, "interest . . . on indebtedness" arose within the meaning of § 163(a) of the I.R.C. Only upon the occurrence or nonoccurrence of certain specified events, says defendant, would the parties be excused from their undeniable obligations. That is, absent the negating conditions subsequent, the parties were bound to proceed with the sale. Consequently, defendant argues, the parties incurred indebtedness sufficient to deem the "interest" accrued at 10.5% per annum between March 1, 1979 and the actual closing

date of the sale as interest income earned by the seller, IP.

#### 2. Plaintiff

Plaintiff contends that the sum of $739,375 labelled as "interest" in the stock purchase agreement clearly represents, from even a cursory reading of the Agreement, an incremental component in the Purchase Price. IP asserts that this increment cannot constitute interest income earned by IP for federal tax purposes since SWF neither borrowed funds from IP nor deferred payments owed to IP. In short, plaintiff argues, IP simply had no obligation to sell the stock to SWF, and SWF had no obligation to purchase the stock until certain, specified conditions precedent occurred. Therefore, no obligations were incurred giving rise to interest income for federal tax purposes. Rather, plaintiff asserts, a careful reading of the Agreement undoubtedly establishes that the incremental payment of $739,375 represented "an inflation factor due to the delay in the closing because of the need for prior ICC approval of the sale." [6]

### C. Discussion

Pursuant to § 163(a) of the I.R.C., deductions from gross income are allowed with respect to the amount of—"*all interest* paid or accrued within the taxable year *on indebtedness.*" [7] 26 U.S.C. § 163(a) (emphasis added). In determining when "indebtedness" arises and, therefore, when "interest" expense may accrue within the meaning of § 163(a), the United States Supreme Court has recognized indebtedness as an obligation to "compensat[e] for the use or forbearance of money." *Deputy v. du Pont*, 308 U.S. 488, 498, 60 S.Ct. 363, 368, 84 L.Ed. 416 (1940) (construing similar language in the 1928 predecessor statute to § 163(a), § 23(b)); *see also Old Colony Railroad Co. v. Commis-*

---

**6.** Pl. Br. at 3–4.

**7.** "Sec. 163. Interest. (a) General Rule.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." 26 U.S.C. § 163. Generally speaking, an inquiry into the nature of interest expense for federal income tax purposes may be inappropriate where a plaintiff simply seeks a determination that the amount labelled as "interest" in a written agreement actually represents a part of the stock purchase price; the amount may not qualify as interest and yet nonetheless constitute part of the purchase price. *See Kieselbach v. Commissioner*, 317 U.S. 399, 405, 63 S.Ct. 303, 306, 87 L.Ed. 358 (1943). Such an inquiry is appropriate here, however, because IP is simultaneously challenging the Commissioner's requirement that IP recognize the amount at issue as interest income.

*sioner,* 284 U.S. 552, 560, 52 S.Ct. 211, 213, 76 L.Ed. 484 (1932) (construing interest as "the amount which one has contracted to pay for the use of borrowed money"). The Supreme Court's interpretation of "interest," therefore, is consonant with the rule of statutory construction applied to the taxing acts which instructs that the legislature is presumed to use terms in their "plain, obvious and rational meaning." *du Pont,* 308 U.S. at 498, 60 S.Ct. at 368; *Old Colony Railroad,* 284 U.S. at 560–61, 52 S.Ct. at 213–14 (Congress intended the word "interest" to have its "usual, ordinary and everyday meaning") (citing *De Ganay v. Lederer,* 250 U.S. 376, 381, 39 S.Ct. 524, 525, 63 L.Ed. 1042 (1919)).

■ Against this background, IP disputes the government's contention that the foregoing interpretation of "interest" does not apply to the explicit contractual payment terms governing its agreement to sell all of its Bay Line stock to SWF for cash. Specifically, the payment terms of the agreement, as previously noted, defined the cash "Purchase Price" for the stock as follows:

> As payment for the transfer of the Shares by IP to SWF, SWF shall deliver to IP on the Closing Date in immediately available New York funds the sum of $13,000,000 and *SWF agrees to pay interest on said sum at the rate of 10½% per annum from the date hereof to the Closing Date* (said purchase price and the interest payable thereon by SWF as aforesaid being hereinafter collectively called the "Purchase Price.")

Jt. Stip. ¶ 15 (emphasis added). Thus, it is clear beyond cavil that, while the parties' own agreement characterizes the sum of 10.5% per annum as "interest," calculated from March 1, 1979 to the actual closing date, it is indisputable that the so-called "interest" amount and the sum of $13,000,000 are *collectively* identified as the "Purchase Price."

Defendant argues, in response, that the parties' use of the term "interest" is unambiguous and, as a matter of law, the parties should be held to the manifest tax consequences of the black-letter of their agreement whether such tax results were intended or not. To support this contention, defen-

dant cites to *Commissioner v. Danielson,* 378 F.2d 771, 775 (3d Cir.1967) (*en banc*), *cert. denied,* 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967). In *Danielson,* plaintiffs executed an agreement to sell stock in a small loan business that included the sellers' covenant not to compete. *Id.* at 772–73. The buyer allocated $152 per share to the covenant and $222 per share to the stock in the contract. *Id.* at 773. These amounts were explicitly allocated on the face of the sales agreement. *Id.* Nonetheless, in filing their federal income tax returns, the sellers claimed all income received on the sale as proceeds from the sale of capital assets. *Id.* In response, the Commissioner issued a deficiency notice asserting that the income attributed to the covenant was taxable as ordinary income. *Id.* at 773–74. In their challenge to the Commissioner's deficiency notice, plaintiffs argued that "the covenants had no independent basis in fact or arguable relationship with business reality." *Id.* at 774. Thus, plaintiffs were seeking a unilateral reformation of the contract by arguing that there was nothing given in exchange for the $152 per share compensation or, in other words, no value was assigned to the covenant not to compete.

In reversing the Tax Court's ruling in favor of plaintiff which held that the entire proceeds represented long-term capital gains from the sale of the stock, the Third Circuit proclaimed what has become known as the *Danielson* rule:

> [A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. . . .

*Id.* at 775. Justifying this rule, the court asserted that any other rule permitting parties to unilaterally reform contracts in search of favorable tax consequences *ex post facto* would jeopardize the reliability and predictability of tax consequences which parties pre-

sumably negotiate prior to committing their agreement in writing.[8] *Id.*

Both the United States Court of Claims and the United States Court of Appeals for the Federal Circuit have explicitly adopted the Third Circuit's *Danielson* rule. *Forward Communications Corp. v. United States,* 221 Ct.Cl. 582, 593–97, 608 F.2d 485, 490–93 (1979); *Proulx v. United States,* 219 Ct.Cl. 363, 378, 594 F.2d 832, 836–40 (1979) (*per curiam*); *Davee v. United States,* 195 Ct.Cl. 184, 196, 444 F.2d 557, 564 (1971); *Eckstein v. United States,* 196 Ct.Cl. 644, 655, 452 F.2d 1036, 1042 (1971) (*per curiam*). Moreover, their adoption has not been confined to cases involving covenants not to compete. *See Dakan v. United States,* 203 Ct.Cl. 655, 666–67, 492 F.2d 1192, 1199 (1974).

In fact, the Federal Circuit's recent decisions in *Lane Bryant, Inc. v. United States,* 35 F.3d 1570 (Fed.Cir.1994), and *Stokely–Van Camp, Inc. v. United States,* 974 F.2d 1319 (Fed.Cir.1992), reaffirmed earlier adherence to the *Danielson* rule. In *Lane Bryant,* plaintiff purchased shares of stock under two separate agreements. 35 F.3d at 1572. The agreements each specified a per share price in excess of the fair market value for the stock. *Id.* at 1574. Although the agreements contained provisions providing for "nonstock items" including "cessation of present and future litigation, payment of transfer taxes, warranties of authorization and title, ... waiver of dividend rights" and an agreement by the seller not to purchase plaintiff's stock for five years, the agreement did not explicitly allocate any portion of the monetary payment to these provisions. *Id.* at 1572. Nonetheless, Lane Bryant asserted that the parties intended to compensate for these items through payment of the purchase

price premium above the fair market value of the stock. *Id.* at 1574. Accordingly, Lane Bryant contended that it was permitted to deduct the *premium* paid for the shares as ordinary and necessary business expenses pursuant to § 162(a) of the I.R.C. *Id.* at 1573.

In rejecting Lane Bryant's claim and affirming the Court of Federal Claims' summary judgment for defendant, the Federal Circuit held that the *Danielson* rule governs instances where an agreement explicitly allocates monetary consideration between stock and nonstock items. *Id.* at 1575. When parties have explicitly made such an allocation, the court reasoned, they have "presumably reflect[ed] their allocation of anticipated tax benefits and burdens." *Id.* at 1576 (citing *Danielson,* 378 F.2d at 775). The Federal Circuit agreed with defendant that Lane Bryant's agreements explicitly allocated all financial consideration to the stock, and, therefore, *ipso facto,* allocated no sums to the nonstock items. *Id.* at 1575. In light of this explicit allocation of funds, the underlying intent of the parties is irrelevant and the agreement controls. *Id.* at 1574, 1575 n. 10. Accordingly, in reaffirming the *Danielson* rule, the Federal Circuit stated that "the *Danielson* rule requires that we take the allocation made by the parties at face value for tax purposes, regardless of what we might think of the 'economic realities' which drove the deal." *Id.* at 1576.

■ Regardless of what this court thinks of the *Danielson* rule,[9] we are nonetheless clearly bound by it as adopted by the Court of Claims and the Federal Circuit.[10] Here

---

8. Similarly, defendant urges application of the *Danielson* rule to the facts here, pointing out the disparate tax treatment both parties gave the $739,375. SWF recognized and reported an interest deduction with respect to the $739,375 increment of the "Purchase Price." On the other hand, IP recognized and reported the receipt of this amount as part of the sales price of the stock subjecting the total sum of $13,739,375 to capital gain treatment.

9. We are mindful of the United States Supreme Court's admonishment that the federal income tax consequences of transactions must not be determined according to the mere form of the transaction chosen by the parties, but rather, are

driven by the actual substance of the transaction. *Weiss v. Stearn,* 265 U.S. 242, 254, 44 S.Ct. 490, 491, 68 L.Ed. 1001 (1924). Accordingly, "the labels employed by the parties to a transaction are not controlling"; the practical effect of the transaction is controlling. *Transamerica Corp. v. United States,* 15 Cl.Ct. 420, 436 (1988), *aff'd,* 902 F.2d 1540 (Fed.Cir.1990) (citing *Helvering v. Lazarus & Co.,* 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939)).

10. *See Lane Bryant,* 35 F.3d at 1574 n. 9 (citing *South Corp. v. United States,* 690 F.2d 1368, 1370 (Fed.Cir.1982)).

defendant argues that IP and SWF explicitly allocated the purchase price of the stock between the $13,000,000 price for the stock and 10.5% per annum for interest and, thus, urges this court to apply the *Danielson* rule of "form over substance."

Defendant misapplies *Danielson* to the present case, however. In *Danielson,* the parties explicitly allocated consideration between the price for the business, at $222 per share, and the covenant not to compete, at $152 per share, on the face of the contract. 378 F.2d at 773. In evaluating the Commissioner's assessment of the federal income tax deficiency against Danielson, the court stated that the Commissioner was not "attacking the transaction in the form selected by the parties," but instead was requiring the parties to adhere to the form of their agreement. *Id.* at 774. If he were attacking the form of the parties' transaction, the court acknowledged that it would then be "required to examine the 'substance' and not merely the 'form' of the transaction." *Id.*

In any event, as explicated below, whether the Commissioner is requiring IP to adhere to its agreement pursuant to the *Danielson* "form over substance" analysis or whether the Commissioner is attacking the form of the payment selected by the parties pursuant to a "substance over form" analysis, we hold that IP did not, on this undisputed factual record, earn interest income, but rather received $13,000,000 plus the $739,375 calculated as 10.5% per annum as the total *purchase price* paid by SWF for the Bay Line stock.

The *Danielson* rule "requires that the tax effects of an agreement flow strictly from the agreement *as written.*" *Lane Bryant,* 35 F.3d at 1573 (emphasis in original). In that

connection, Article 2 of the agreement, *supra,* explicitly states that the two sums, $13,-000,000 plus the 10.5% per annum calculation, are "collectively called the 'Purchase Price.'" Jt. Stip. ¶ 15.[11] Thus, facially, the plain terms of the agreement fail to make an explicit allocation of funds to anything other than "payment for the transfer of the Shares by IP to SWF." Jt. Stip. ¶ 15. In other words, although the purchase price includes a sum labelled *interest,* "[a]ll financial consideration is allocated in that clause, in exchange for the stock. As a simple matter of mathematics, that means that *no* money is left over to allocate toward the non-stock items." *Lane Bryant,* 35 F.3d at 1575 (emphasis in original). Therefore, to apply *Danielson* and hold the parties to the explicit terms of their agreement requires IP to recognize and report the total $13,739,375 as the inclusive "Purchase Price" received on the sale of its Bay Line stock.

In contrast, the Commissioner's challenge to IP's treatment of the $739,375 as part of the sales price of the Bay Line stock may alternatively be considered as an attack on the "form" of payment chosen by the parties. That is, although the parties have explicitly designated an aggregate sum as the "Purchase Price" for the Bay Line stock, the Commissioner's deficiency notice may be viewed as an attack on this form whereby the Commissioner is requiring IP to instead recognize and report such "purchase price" as a bifurcated payment of principal and interest. Accordingly, under this alternative view of the Commissioner's challenge, this court is required to examine the substance of the transaction, rather than apply the *Danielson* rule.[12] *Danielson,* 378 F.2d at 774.

---

**11.** Notably, the receipt acknowledging SWF's final payment for the Bay Line stock on September 12, 1979, similarly evidences the parties explicit allocation of the $13,000,000 plus 10.5% per annum amount ($739,375) to the total purchase price for the Bay Line stock: "IP hereby acknowledges the receipt from SWF of $13,739,-375 ... *constituting the full amount of the Purchase Price* payable under the Agreement...." Jt. Stip. ¶ 21 (emphasis added).

**12.** It is questionable whether the Federal Circuit would extend the *Danielson* rule to cases such as this one where the court is required to evaluate whether the statutory requirement of "interest

... on indebtedness" within the meaning of § 163(a) is satisfied. For example, our predecessor court has found it necessary to examine the substance of the transaction where the parties explicitly allocated sums to "interest" in a sales contract. *Pratt–Mallory Co., Inc. v. United States,* 82 Ct.Cl. 292, 295, 12 F.Supp. 1020, 1023 (1936). This case was decided approximately 11 years before *Danielson.*

In *Pratt–Mallory,* which serves as a binding precedent and closely parallels the facts of this case, plaintiff claimed an interest deduction of $22,131.91, which it paid in connection with the purchase price exchanged for a grocery business.

In examining the substance of the transaction in the present case to determine whether IP actually earned interest income, *Starker v. United States*, 602 F.2d 1341 (9th Cir. 1979), is instructive. There the United States Court of Appeals for the Ninth Circuit examined the practical effect of a 6% "growth factor" stipulated in a sales contract for timber. This factor allegedly served to compensate the seller for timber growth on the property during the interim period during which the sales contract was executed and the physical transfer of property took place. *Id.* at 1356. The court there held that the "growth factor" represented compensation for the "use of unpaid amounts owed" to the seller, and, therefore, such amounts constituted "disguised interest." *Id.* The primary factors leading the court to its determination were that—(i) pursuant to the contract, the timber owner had conveyed title in the timber to the purchaser, and (ii) he thereafter did not retain any ownership rights or any risk of loss. *Id.* In addition, the court noted that the seller would have received the 6% growth factor regardless of the actual timber growth on the property prior to execution of the sale. *Id.*

Applying the *Starker* factors here at bar, IP did not convey legal title to SWF in any Bay Line stock *prior* to the actual closing date of September 12, 1979. Moreover, IP retained all risk of loss for Bay Line prior to the actual closing date. For example, IP retained "risk of loss by fire or other casualty to the properties of Bay Line" prior to the

actual closing date. Jt. Stip. ¶ 29. In addition, SWF was entitled to unilaterally terminate the agreement any time before the closing date upon "any material loss, casualty or adverse change ... with respect to the properties, business, or operations of Bay Line." Jt. Stip. ¶ 25. Also, SWF would have had no financial obligation to IP upon the event that it pursued its rights under the agreement to cancel the sale. Thus, in contrast to the plaintiff in *Starker*, IP retained all risk of loss prior to the physical transfer of the stock on the closing date of the sale.

■ Finally, it is clear that unlike the plaintiff in *Starker*, IP also retained ownership rights in the stock prior to the closing date. Conversely speaking, no ownership rights in Bay Line were transferred to SWF prior to the closing date on September 12, 1979. A sale is completed and ownership rights transfer to the buyer when the buyer acquires the "benefits and burdens of ownership." *Paccar v. Commissioner*, 85 T.C. 754, 777, 1985 WL 15411 (1985), *aff'd*, 849 F.2d 393 (9th Cir.1988); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237, 1981 WL 11305 (1981). This inquiry is a factual one based on the intent of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances. *Hatch v. Standard Oil Co.*, 100 U.S. (Otto) 124, 131, 25 L.Ed. 554 (1879); *Commissioner v. Segall*, 114 F.2d 706, 709 (6th Cir.1940), *cert. denied*, 313 U.S. 562, 61 S.Ct. 838, 85 L.Ed. 1522 (1941); *Paccar*, 85 T.C. at

---

82 Ct.Cl. at 299, 12 F.Supp. at 1023. This interest deduction was calculated according to a provision in the parties' contract *dated July 20, 1925*, which stated:

> To the remaining sum so found, should be added interest at the rate of four and one-half (4½) percent per annum *from the close of business for the year 1924 to the date of acceptance and full performance of this proposition.*

82 Ct.Cl. at 294, 12 F.Supp. at 1020 (emphasis added). The parties concluded the sale and transferred possession *on July 22, 1925*, two days after signing the contract. 82 Ct.Cl. at 294, 12 F.Supp. at 1021. Since the purchaser was not itself indebted during the year 1924 in which the interest accrued, but instead assumed the debt of an existing entity, the court disallowed the purchaser's claimed interest deduction stating:

> Although it was denominated interest as a means of adjusting the purchase price, it was not such an item of interest as was legally

deductible in determining net income. It represented an additional amount paid by plaintiff and received by the Pratt Company for the assets, and such a payment does not constitute an allowable deduction from gross income....

82 Ct.Cl. at 299, 12 F.Supp. at 1023. Therefore, this decision makes it clear that an amount labelled "interest" by the parties' agreement which is calculated over time by a percentage multiplier does not mandate that the amount be deemed interest for purposes of federal income tax. It is necessary to examine the substance of the transaction. *See Davidson v. United States*, 137 Ct.Cl. 416, 149 F.Supp. 208, 211 (1957) ("The true nature of the payment must be looked at ... regardless of the name which, for other purposes, might be applied to the payments."); *see also* Mertens Law of Federal Income Taxation § 26.04 ("The operating principle in determining whether payments are interest is the rule that facts, not the terms employed, control.").

777; *Derr v. Commissioner*, 77 T.C. 708, 724, 1981 WL 11300 (1981).

Defendant argues that when IP and SWF executed their agreement on March 1, 1979, SWF became obligated to pay IP the purchase price of the stock, $13,000,000, plus interest accrued until the sum was paid, subject to conditions subsequent to the agreement.[13] In essence, defendant asserts that the parties entered into a "contract of sale" on March 1, 1979. Plaintiff, on the other hand, contends that a mere "contract for sale" was executed on March 1, 1979, and that the parties did not engage in a completed sale until the actual closing date upon the realization of certain conditions precedent.

█ In this connection, it is significant to note that the stipulated facts disclose that it was only on the actual closing date, *i.e.,* September 12, 1979, that SWF acquired the Bay Line stock and obtained legal title. Although the possession of bare legal title is an important indicator of when the "benefits and burdens of ownership" passed to the buyer, it is rarely as significant for tax purposes as the buyer's "actual command" over the property involved. *Frank Lyon Co. v. United States*, 435 U.S. 561, 573, 98 S.Ct. 1291, 1298, 55 L.Ed.2d 550 (1978). Thus, it is necessary to evaluate whether SWF acquired an equitable interest in the stock prior to the actual closing date.

In determining when or whether a buyer acquired the "benefits and burdens of ownership," *Bradford v. United States*, 195 Ct.Cl. 500, 518, 444 F.2d 1133, 1144 (1971), instructs that we examine the intent of the parties based on the terms of the agreement underlying the transaction. There, the court found that the parties intended the transfer of the "benefits and burdens of ownership" of the stock "no later than the moment of acquisition by [the third-party dealer] and not at the later 'closing date.'" *Id.*, 444 F.2d at 1144. When the third-party dealer acquired the shares of stock for the intended transfer of the stock to the buyer at closing, there was nothing left to be performed except pay-

ment of the purchase price. *Id.* at 517, 444 F.2d at 1143. In other words, substantial performance of the conditions precedent imposed an unconditional obligation on the buyer to purchase the stock at the point the dealer acquired the stock. *Id.* at 518, 444 F.2d at 1143. Similarly, at that point, the buyer also acquired, "an absolute right to title" in the shares and "[a]s a practical matter, the significant incidents of ownership in the ... stock such as appreciation and depreciation in value...." *Id.* at 519, 444 F.2d at 1144.

Upon a facial review of the agreement between SWF and IP, it is evident that the parties intended to consummate the sale and transfer the benefits and burdens of ownership of the Bay Line stock only *on the actual closing date* and not on March 1, 1979, when they signed the agreement. The agreement established a "Closing Date" of August 1, 1979, upon which IP would transfer physical possession as well as legal title to its Bay Line stock to SWF in exchange for the "Purchase Price." Jt. Stip. ¶¶ 13, 14. This date, of course, was subject to extension based on the receipt of all necessary approvals and authorizations of the sale from the ICC. Within 30 days of such approval, a transfer of cash for stock would occur on the "Closing Date." Jt. Stip. ¶ 13 and Appendix: Stock Purchase Agreement, p. 16, ¶ 10.

█ In addition to the pre-condition of ICC approval, the sale was also contingent on the satisfaction of several other significant conditions. First, IP was required to *refrain* from the following activities:

1. Selling, issuing, or transferring any corporate securities of Bay Line;

2. Satisfying any noncurrent liability of Bay Line;

3. Transferring or mortgaging any of Bay Line's tangible or intangible assets;

4. Modifying Bay Line's corporate by-laws;

5. Altering its Banking arrangements;

---

13. "A condition subsequent operates to vest title in the grantee subject to a right of termination in the grantor upon the grantee's breach of a failure to perform the express condition." *Major Realty* *Corp. v. Commissioner*, 42 T.C.M. (CCH) 373, 1981 WL 10663 (1981) (citations omitted), *aff'd in part, rev'd in part*, 749 F.2d 1483 (11th Cir. 1985).

6. Modifying or instituting any deferred compensation plans;

7. Issuing a dividend; and

8. Making capital expenditures or investments.

Jt. Stip. ¶ 24. Moreover, IP was even required to obtain SWF approval upon Bay Line's payment or obligating itself to pay over $10,000. Defendant nevertheless asserts that SWF obtained equitable title due to the explicit terms in the agreement restricting the actions of IP, its officers and employees, and those of Bay Line, during the period March 1, 1979, through the actual closing date. Pursuant to *Bradford*, however, mere restrictions on the seller do not, *ipso facto*, confer equitable title on the buyer; rather, the buyer must first receive the benefits and burdens of ownership.

 Although SWF may have ultimately received benefits from these restrictions, such benefits were insufficient to transfer equitable ownership of the stock. The restrictions on IP's conduct served to ensure that the stock SWF ultimately purchased was the same stock that was represented to it on the day of the agreement; the restrictions did not consummate a sale and unconditionally obligate SWF to pay IP. In fact, any failure of IP to abide by the contractual restrictions permitted SWF to unilaterally terminate the agreement with impunity. Thus, SWF's obligation to buy the stock, rather than made unconditional, was conditioned upon IP's covenant not to perform certain specified acts.

Next, we observe that SWF was obligated to buy the stock only upon the satisfaction of additional conditions including:

1. Prior to the Closing Date, there was no "material loss, casualty, or adverse change" suffered by the properties, business or operations of Bay Line;

2. SWF was satisfied with certain aspects of particular litigation involving a Bay Line derailment; and

3. ICC authorization for the stock transfer occurred prior to December 31, 1979.

Jt. Stip. ¶ 25. Finally, Article 6 of the agreement required satisfaction of all seven miscellaneous conditions contained therein before SWF was obligated to purchase the stock. SWF, therefore, would incur no financial obligation by terminating the agreement in accordance with its rights under the contract, if all of the above conditions were not satisfied. IP also had a right to unilaterally terminate the agreement if a variety of conditions in the agreement were not satisfied.

 When determining whether indebtedness arises within the meaning of § 163(a), it is not enough that the agreement imposed an obligation on the parties. *du Pont*, 308 U.S. at 497, 60 S.Ct. at 368. The obligation to pay money must be unconditional and must relate to the use or forbearance of money. *Id.*; *Knetsch v. United States*, 364 U.S. 361, 367, 81 S.Ct. 132, 135, 5 L.Ed.2d 128 (1960); *Autenreith v. Commissioner*, 115 F.2d 856, 858 (3d Cir.1940); *Ford v. Commissioner*, 51 T.C.M. (CCH) 608, 1986 WL 21848 (1986). Here, the manifest intent of the parties, as indicated by the plain terms of their agreement, was to impose an unconditional and legally enforceable obligation to pay money only on the actual closing date of the sale. Prior to that time, the obligations of the parties were conditional. Only on the actual closing date would the conditions under the agreement be substantially performed so as to leave payment of the purchase price the only remaining duty to be performed under the contract, as in *Bradford*, 195 Ct.Cl. at 517, 444 F.2d at 1143. Only on that date was SWF, therefore, legally bound to transfer an aggregate cash payment of $13,739,375 to IP. In sum, the factors posed in *Bradford*, *id.* at 517–19, 444 F.2d at 1143–44, as applied to the facts of the present case, indicate that IP and SWF intended that the benefits and burdens of ownership of the stock be transferred to SWF on the closing date and not before. Accordingly, upon a practical review of the form and substance of the parties' stock-for-cash transaction agreement, we hold that IP did not earn "interest ... on indebtedness" within the meaning of § 163(a) during the period March 1, 1979, through September 12, 1979.

### D. *Conclusion*

Plaintiff's partial motion for summary judgment respecting the Contract Purchase Price issue is, therefore, hereby GRANTED, and defendant's parallel partial motion for summary judgment is hereby DENIED.

### III. DISC ISSUE

#### A. *Facts*

The issue of law we must decide here is—whether IP and International Paper Export Corporation (IP Export), for purposes of computing DISC commissions at 50% of combined taxable income on the export sale of finished wood products, must first deduct forest management expenses incurred to cultivate and manage standing timber deemed sold under § 631(a) in determining such combined taxable income.

Between the years 1972 through 1979, IP deducted operational expenses incurred in the cultivation and maintenance of its standing timber. These "forest management expenses" include costs associated with "hardwood control, stand description, hazard reduction, noncommercial thinning, slash disposal, woods roads, fire suppression, and also salaries and other field and office administrative expenses...." Jt. Stip. ¶ 34. In short, these costs are incurred to improve a forest's yield and quality of standing timber. The amount and deductibility of these costs are not disputed by the parties.

During the years at issue, IP Export, a wholly-owned subsidiary of IP, served as a commissioned Domestic International Sales Corporation (DISC) within the meaning of § 992(a). IP manufactured finished wood products from timber grown on its own timberlands and subject to an election under § 631(a). IP Export, as IP's commission agent for the export sale of IP's finished wood products, earned a commission from export sales of the wood products, which was calculated by the so-called 50–50 combined taxable income method contained in § 994(a)(2) of the I.R.C. and Treas.Reg. § 1.994–1(c)(3). Under this method, IP Export's maximum commission constitutes (i) 50% of the "combined taxable income" (CTI) earned by IP Export and its parent, IP, on its export sales of the manufactured wood products, plus (ii) 10% of certain export promotion expenses not at issue here. Jt. Stip. ¶ 39. IP computed IP Export's commission income by, *inter alia*, subtracting from the export receipts, the fair market value of the timber used in manufacturing the exports as of the first day of the federal tax year. The legal question dividing the parties is—whether the forest management expenses incurred by IP in its timber business must also be included as a cost in computing the CTI and, consequently, IP Export's DISC commission income under § 994(a)(2).

Upon defendant's audit of the 1977 through 1979 tax returns of IP and IP Export, defendant demanded that plaintiff include its forest management expenses in its CTI, as plaintiff had previously done during the years 1972 through 1976. The effect of this requirement is a decrease in the amount of export income and, therefore, a decrease in the amount of commission payable to IP Export. Plaintiff argues, however, that it is due a corporate tax refund for the years 1972 through 1979 because its forest management expenses were erroneously included in the CTI of IP and IP Export in the computation of IP Export's commission income.

#### B. *Contentions of the Parties*
##### 1. *Defendant*

Defendant acknowledges that the fair market value of IP's cut timber subject to the § 631(a) election serves as an element of cost of goods sold of IP's exported finished wood products in calculating the CTI of IP and IP Export. Therefore, gains (or losses) realized from the § 631(a) election, *i.e.*, the difference between IP's adjusted basis and the fair market value of the timber, although recognized by IP as capital gains, should not be included in the CTI from the exports. Nevertheless, defendant contends that, as a matter of law, IP must deduct, in arriving at the CTI, certain forest management expenses incurred for the cultivation and maintenance of its timberlands subject to § 631(a) timber treatment in calculating IP Export's commission income since, it asserts, IP incurs such expenses to produce the income ultimately derived from the finished wood products.

Defendant avers, moreover, that IP's practice of deducting its forest management expenses as ordinary and necessary business expenses, rather than capitalizing such costs, is inconsistent with IP's assertion that these costs are reflected in the cost of goods sold mechanism for § 631(a) timber. Since IP takes an ordinary business expense deduction for its forest management expenses in recognizing capital gain pursuant to its § 631(a) sale or exchange election, then IP cannot, in essence, generate this benefit a second time by failing to deduct them as an expense in calculating its CTI preparatory to establishing its base for determining its DISC commission under the 50% rule pursuant to § 994(a)(2).

### 2. *Plaintiff*

Conversely, plaintiff asserts that defendant erroneously treats its (IP's) timber cutting activities and manufacturing activities as one unified business, rather than two related but separate businesses. In other words, IP argues that the forest management expenses incurred in cultivating and managing its standing timber are *unrelated* to the class of gross income, considered "business income," derived from the sale of manufactured or processed wood exports. Rather, IP argues that these expenses are directly related to the class of gross income, considered "property income," realized on the cutting of its standing timber pursuant to § 631(a). Consequently, IP contends that its forest management expenses are allocable only to property income from timber sales and not business income from manufacturing sales.

Further, and more importantly, IP argues that its forest management expenses are "subsumed" by the cost of goods sold mechanism of Treas.Regs. §§ 1.994–1(c)(6)(ii) and 1.61–3, and, therefore, such expenses should *not* be deducted from the CTI of IP and IP Export a second time. That is to say, by utilizing the fair market value of the cut timber *as the cost of goods sold in the CTI*, the CTI necessarily includes and implicates all operating expenses of the timber business under the § 631(a) election. Therefore, requiring plaintiff to separately deduct forest

management expenses as an independent line item from the CTI effectively duplicates expenses deducted in arriving at a CTI in computing DISC commissions on exported goods under the 50% rule in § 994(a)(2).

Finally, plaintiff avers that defendant's position is inconsistent with the legislative intent underlying § 631(a), which seeks to minimize the disparity in federal tax treatment provided to integrated forest products companies and independent timber growers. IP asserts that a significant disparity in tax treatment results between itself as an integrated forest products company and other independent timber producers and manufacturers where IP is required to deduct its forest management expenses from its combined taxable income realized from the sale of finished wood products abroad. The disparity allegedly occurs because an independent manufacturer of wood products who purchases timber from an independent timber producer is not similarly required to deduct forest management expenses from its CTI derived from export sales of its finished wood products. Thus, IP seeks to prevent the foregoing disparity in tax treatment and requests that this court find, as a matter of law, that IP need not deduct its forest management expenses from its CTI for purposes of calculating the commission of its DISC, IP Export.

With the parties' foregoing contentions as explicated above, this court analyzes the legal bases on which the parties rest their motions for partial summary judgment.

### C. *Discussion*

Enacted as part of the Revenue Act of 1971, Pub.L. 92–178, the Domestic International Sales Corporation (DISC) program served as a tax incentive to U.S. corporations to increase exports of domestic products and improve the balance of payments in this country.[14] The incentive underlying this legislative scheme was intended to encourage

---

**14.** *See* S.Rep. No. 92–437, 92d Cong., 1st Sess. 17 (1971), *and* H.Rep. No. 92–708, 92d Cong.,

1st Sess. 51 (1971), U.S.Code Cong. & Admin.News 1971, pp. 1825, 1925, 2073.

domestic corporations to optimize export sales and leases through a related DISC and, as a consequence, defer federal income tax imposed on one-half of the DISC's export earnings until, *inter alia,* such earnings were distributed to shareholders. § 995. The remaining portion of the DISC's taxable income is taxed at the shareholder level, whether or not it is actually distributed. §§ 991 and 995.

As a related supplier of IP Export, IP is permitted by statute to elect one of three ways to calculate its portion of federal income tax subject to deferral. § 994(a). In this case, IP elected the 50% combined taxable income (CTI) method. This method allowed IP Export to realize and defer from federal income tax up to 50% of the CTI of both IP and IP Export attributable to the export sales, plus 10% of certain promotion expenses.[15] § 994(a) and (b); Treas.Regs. §§·1.994–1(c) and 1.994–1(d)(2). In this context, IP and IP Export's CTI is the difference between (i) IP Export's gross receipts from the sale of the manufactured products abroad and (ii) the total costs related to such gross receipts incurred by both IP and IP Export. § 994(a)(2); Treas.Reg. § 1.994–1(c)(6).

In determining the total costs related to the finished wood products exported (hereinafter referred to as "exports"), the cost of such goods sold is not the adjusted basis of the timber in the situation where the taxpayer has made a § 631(a) election. Instead, where the taxpayer has elected to treat the cutting of its timber as a sale or exchange under § 631(a), the taxpayer must treat the fair market value of that timber as the cost of the exports sold.[16] Treas.Regs. §§ 1.994–1(c)(6)(ii), 1.631–1(d)(3) and (e); *Longview Fibre Co. v. Commissioner,* 71 T.C. 357, 362, 1978 WL 3319 (1978).

■ Although IP in fact utilized the fair market value of the timber as the cost of the exports sold by IP Export in calculating the CTI, defendant now curiously contends that IP must also add to its total costs related to the exports certain forest management expenses IP incurred in growing and managing its standing timber. Defendant asserts that since IP deducted these expenses from its ordinary income, the forest management expenses are not reflected in the cost of the exports sold. Essentially, defendant argues that the costs associated with the exports are understated and, thus, IP's federal income tax subject to deferral under the DISC provisions is overstated. Plaintiff, on the other hand, contends that defendant's position is without merit. This court agrees.

Whether IP deducted the forest management expenses from its ordinary income or capitalized such costs, these expenses are, in either case, clearly reflected in the cost of the related exports sold. This is so because, upon making a § 631(a) election, IP recognized the fair market value of the harvested timber as the cost of the exports sold in calculating its CTI.[17] Since this fair market

---

**15.** Specifically, § 994(a)(2) provides:

50 percent of the combined taxable income of such DISC and such person [described in section 482] which is attributable to the qualified export receipts on such property derived as the result of a sale by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts....

26 U.S.C. § 994(a)(2).

**16.** The Treasury Regulations set forth this requirement under the DISC provisions as follows:

... With respect to property which an election under section 631 applies (relating to cutting of timber considered as a sale or exchange), cost of goods sold shall be determined by applying § 1.631–1(d)(3) and (e) (relating to fair market value as of the beginning of the taxable year of the standing timber cut during the years considered as its cost).

Treas.Reg. § 1.994–1(c)(6)(ii). In turn, Treas. Reg. § 1.631–1(d)(3) states:

(d) *Computation of gain or loss under the election.*
 \* \* \* \* \* \*

(3) The fair market value as of the beginning of the taxable year of the standing timber cut during the year shall be considered to be the cost of such timber, in lieu of the actual cost or other basis of such timber, for all purposes for which such cost is a necessary factor. See paragraph (e) of this section.

 \* \* \* \* \* \*

(e) *Computation of subsequent gain or loss.*

(1) ... When the election under section 631(a) is in effect, the cost of standing timber cut during the taxable year is determined as if the taxpayer had purchased such timber on the first day of the taxable year. Thus, in determining the cost of the products so sold, the cost of the timber shall be the fair market value on the first day of the taxable year in which the standing timber was cut, in lieu of the actual cost or other basis of such timber.

26 U.S.C. §§ 1.631–1(d)(3) and (e)(1).

**17.** Capital gains (or losses) under § 631(a) constitute the difference between the adjusted basis

value figure necessarily incorporates all costs related to producing the timber, the fair market value of the timber must necessarily reflect the forest management expenses incurred to grow and manage the timber as well. Therefore, the forest management expenses, as reflected in the fair market value of the timber representing the cost of the exports are reflected in the total cost factor used for calculating IP's CTI and need not be accounted for a second time, as defendant suggests.

In addition to the § 631(a) fair market value amount of the harvested timber, also included in the cost of goods of the exports sold, are "certain cutting and transportation costs." Jt.Stip. ¶ 40; *See* Treas.Reg. § 1.631–1(e)(2). Accordingly, defendant asserts that IP's forest management expenses qualify as another such includible cost as an element of the cost of goods sold. Additional costs related to gross receipts from *export sales* include:

> ... (a) the expenses, losses, and other deductions *definitely related,* and therefore allocated and apportioned, thereto, and (b) a ratable part of any other expenses, losses, or other deductions which are not definitely related *to a class of gross income, determined in a manner consistent with the rules set forth in § 1.861–8.*

Treas.Reg. § 1.994–1(c)(6)(iii) (emphasis added). In determining whether an expense, loss, or other deduction is definitely related to a particular "class of gross income," taxpayers are guided by § 61 of the I.R.C. and the apportionment and allocation provisions of the Treasury Regulations. Specifically, Treas.Reg. § 1.861–8(a)(3) lists the various classes of gross income from which separate deductions may be made for purposes of computing CTI. A "statutory grouping of gross income" refers to "gross income from a specific source or activity" according to which an operative I.R.C. section applies in determining taxable income. Treas.Reg. § 1.861–8(a)(4). Section 994(a)(2), setting forth the CTI method of transfer pricing for a commission DISC, is such an operative I.R.C. section. Treas.Reg. § 1.861–8(f)(1)(iii). For example, in this case, the "statutory grouping of gross income" is the "gross receipts from the sale of exports." On the other hand, the "residual grouping of gross income" represents "[g]ross income from other sources or activities." Treas.Reg. § 1.861–8(a)(4).

Defendant contends that IP's forest management expenses are definitely related to the gross receipts from sales of *export property* since they are incurred in the course of IP's activity of producing the logs, which are then manufactured into the products sold abroad by IP Export. Conversely, plaintiff argues that its total gross income is derived from its two separate businesses (the timber business and the manufacturing business) and, therefore, from two separate classes of gross income. Accordingly, IP asserts that its gross income from its timber business qualifies as "gains derived from dealings in property," and gross income from its manufacturing business is "gross income derived from business." *See* Treas.Regs. § 1.861–8(a)(3)(iii) and (ii), respectively. We find plaintiff's argument persuasive.[18]

Section 631(a) of the I.R.C. permits a taxpayer to treat the cutting of timber as a sale or exchange of a capital asset pursuant to § 1231. Since IP chose to make this election in its timber business and, specifically, for cutting timber used in its manufacturing, the income derived therefrom is appropriately classified as gross income "derived from dealings in property." I.R.C. § 61(a)(3). Similarly, it is reasonable that sales income from the export of manufactured goods, or inventoried goods, may appropriately be con-

---

in the timber and the fair market value of the timber. Where the fair market value of said timber is thereafter used as a cost of goods sold in computing the CTI, the CTI must implicitly include any capital gain recognized pursuant to IP's § 631(a) election also as a cost of goods sold. Accordingly, the capital gains recognized

under § 631(a) are not added to the taxpayer's gross income in calculating the CTI.

**18.** In light of the parties' Joint Stipulations Of Fact, *i.e.,* ¶¶ 9 and 10, defendant does not dispute these assertions.

sidered "gross income derived from business." I.R.C. § 61(a)(2). The foregoing findings confirming IP's two classes of gross income, the issue, thus, becomes—to which of these classes does IP's forest management expenses "definitely relate[ ]" as this term is used in Treas.Reg. § 1.994–1(c)(6)(iii), *supra.*

The relevant Treasury Regulations provide that—

> A deduction shall be considered *definitely related* to a class of gross income and therefore allocable to such class if it is incurred as a result of, or incident to, an activity or in connection with property from which such class of gross income is derived. . . .

Treas.Reg. § 1.861–8(b)(2) (emphasis added). Therefore, the plain terms of this regulation implicitly instruct that we find—whether IP's forest management expenses are "incurred as a result of, or incident to, an activity or in connection with" either IP's timber business or manufacturing business, and, therefore, "definitely relate" to IP's class of gross income derived from IP's timber harvests or IP's sales of manufactured exports, respectively. *Id.*

During the years 1972 through 1979, IP's timber was subject to a § 631(a) election, thereby deeming the timber a § 1231 asset sold or exchanged in the year of harvest. This timber was used, at least in part, in IP's manufacturing of the finished wood products exported by IP Export. IP's gross income from its timber business included such deemed timber sales pursuant to § 631(a). This income from IP's timber business, as discussed *supra,* may properly be categorized as gross income "derived from dealings in property." Similarly, through the parties' Joint Stipulations Of Fact, they agree that

"International has historically employed forest management practices in its timber growing operations [in cultivating, and maintaining its timber] . . . to increase the yield and quality of timber produced from the forest." Jt. Stip. ¶¶ 36, 34, and 37, respectively. Accordingly, since expenses associated with these forest management practices were "incurred as a result of, or *incident to,* an activity or *in connection with property* [*i.e.,* § 631(a) timber growth and management] from which such class of gross income [*i.e.,* gross income derived from dealings in property] is derived," Treas.Reg. § 1.861–8(b)(2) (emphasis added), such forest management expenses must necessarily "definitely relate" to IP's timber business.

Consequently, since IP's forest management expenses are "related" to IP's timber business, we believe, on these facts, that they are not "definitely related" to IP's manufacturing business, and thus should not be included in the CTI computation.[19] Or, conversely speaking, since the § 631(a) income or gain is *not* included in the statutory grouping of gross income categorized as "gross receipts derived from business," the forest management expenses associated with the development of the § 631(a) gain cannot be included in this statutory grouping either.

Although defendant argues that *Longview Fibre Co. v. Commissioner,* 71 T.C. 357, 1978 WL 3319 (1978), is inapposite here, defendant nevertheless attempts to favorably analogize the facts. In *Longview Fibre,* the court addressed the narrow issue of whether the fair market value of timber deemed sold or exchanged under the § 631(a) election must be deducted instead of the timber's cost basis from the CTI of a parent company and its DISC subsidiary which exported the timber logs abroad. With respect to the CTI calculation, the parties and the Tax Court agreed that plaintiff's "amortization-roads" expenses were appropriately added to this fair market value to derive the costs of goods sold, and thus were expenses deductible from

---

**19.** *St. Jude Medical, Inc. v. Commissioner,* cited by defendant, is, therefore, distinguishable. 97 T.C. 457, 1991 WL 221136 (1991), *aff'd in part, rev'd in part,* 34 F.3d 1394 (8th Cir.1994). There, the Tax Court evaluated the factual relationship between costs associated with unsuccessful research and development (R & D) and plaintiff's gross income from related manufactured prod-

ucts and found a close factual nexus. Moreover, in *St. Jude Medical, Inc.,* Treas.Reg. § 1.861–8(e)(3) directs the specific allocation and apportionment of R & D costs to broad product categories, whereas there is no similar directive respecting forest management expenses at issue in this case.

plaintiff's gross receipts in determining the CTI. 71 T.C. at 361.

Insofar as IP does not dispute that the fair market value of the timber used in manufacturing its exports, rather than the adjusted costs basis (or depletion basis) of the harvested timber, represents a cost of the exports sold in calculating the CTI and IP Export's commission, we agree that *Longview Fibre* is inapposite. This court finds in addition, however, that *Longview Fibre*'s recognition that the "amortization-roads" costs are included in the calculation of the cost of goods sold of the exported timber logs in *Longview Fibre* is similarly inapposite to the case at bar for two reasons.

First, *Longview Fibre* is factually distinguishable from the case at bar. In that case, although Longview Fibre cultivated and managed its own timberlands and manufactured wood products, it did not utilize its own timber to supply its manufacturing operations. 71 T.C. at 359. Instead, Longview Fibre purchased wood fiber needed for its manufacturing operations from others. More significantly, however, it exported timber logs, not manufactured wood products, through its DISC, Longview Fibre Co. International. *Id.* Thus, the Tax Court did not have to address issues pertaining to separate classes of gross income derived from the company's timber growing activities and its manufacturing business, as required in this case for application of Treas.Regs. §§ 1.994–1(c)(6)(iii) and 1.861–8(b)(2).

Second, and with respect to this latter point, the Treasury Regulations clearly direct that the apportionment and allocation of deductions are based on their "factual relationship" to the gross income. Treas.Reg. § 1.861–8(a)(2). Yet defendant has failed to show how the factual relationship between plaintiff's "amortization-roads" costs and plaintiff's class of gross income in *Longview Fibre* and the factual relationship between IP's forest management expenses and its export receipts are, as it asserts, "indistinguishable." It is significant, moreover, that the

Tax Court and the parties in *Longview Fibre* did not recognize or argue for a deduction of forest management expenses from the plaintiff's CTI computation, although such costs are presumably expenses commonly incurred by timber companies. *See* 71 T.C. at 360–61, 361 n. 5. Thus, this court finds that *Longview Fibre* is factually and legally distinguishable from the case at bar and, therefore, not dispositive of the specific issues presented here.

### D. *Conclusion*

For the foregoing reasons, plaintiff's motion for partial summary judgment insofar as it relates to the DISC Issue, is GRANTED, and defendant's motion for summary judgment respecting this issue is DENIED.

## IV. CONSOLIDATED RETURN ISSUE

### A. *Facts*

With respect to this issue, the question is—whether the legislative regulations promulgated under § 1502 require the parent, IP, in a consolidated federal income tax return year, to treat its timber transfers to its subsidiary, International Logging Corporation (ILC), in a transaction described in § 631(b), as a deferred intercompany transaction, such that the capital gain recognized with respect to such transfers must be recharacterized as ordinary income, where the subsidiary, ILC, did not have an "economic interest" in said timber inasmuch as it did not independently possess the power to dispose of the same on the open market.

During the years 1973 through 1979, IP timely filed consolidated federal income tax returns under I.R.C. § 1501, which included its affiliated group of corporations pursuant to § 1504(a) of the I.R.C. In that time frame, ILC was a wholly-owned member of IP's affiliated group.[20] By contract, IP engaged ILC to cut its standing timber and transport the timber to its own facilities and to third-party purchasers in Canada. In furtherance of this activity, ILC employed approximately two to three ministerial clerks and timber scalers who were paid on an

---

**20.** 26 U.S.C. § 1504(a) provides that a parent corporation's ownership of 80% or more of the

voting stock of another qualifies the corporations as "affiliates."

hourly basis. Compensation for performing these duties, on behalf of ILC, was funded by IP through a "zero balance bank account" on ILC's payroll books. Jt. Stip. ¶ 51. All other ILC employees, including administrative officers, were full-time employees of IP and were stationed at IP facilities. These employees and officers negotiated and executed all of ILC's contracts and transactions. In short, IP "exercised complete control over ILC." Jt. Stip. ¶ 48.

Generally, ILC executed two sets of timber contracts. The first set was between ILC and IP. The second set involved ILC and third parties. In the former set of contracts, IP granted ILC cutting rights with respect to IP's northeastern timber. For example, ILC executed "Stumpage Permits" which granted ILC a right of entry on IP's property for the purpose of cutting and hauling a particular amount and type of timber. All timber subject to the stumpage permits remained the property of IP until ILC completed all payments due. The permits contained a property and personal injury indemnity clause and required ILC to maintain workmen's compensation insurance coverage for all persons entering IP's premises.

In all of its cutting contracts with ILC, IP expressly identified the location, species, and size of the standing timber subject to ILC's cutting rights. Moreover, IP retained title to the timber until the timber was cut. In addition, IP specified in the contracts the per unit charge for the various types of timber. IP even predetermined the disposition of the particular timber; that is to say, ILC did not independently control the timber's ultimate disposition. In substance, ILC did not retain or process any harvested timber under the cutting contracts.

Under the second set of contracts, ILC entered into two types of contracts with third parties. The first type, designated log sales agreements, facilitated the sale of delivered logs or pulpwood. ILC received payment for the delivered timber equal to the price ILC paid to independent contractors hired to cut and haul the logs and pulpwood plus the stumpage rates ILC paid under its parallel cutting contracts with IP. In short, ILC received a price for the timber delivered under these third-party contracts equal to the amount owed IP under its parallel cutting contracts.

The second type of third-party contract executed by ILC, designated cutting contracts, paralleled the cutting contracts ILC executed with IP. In fact, ILC's cutting contacts with third parties were executed contemporaneously with its cutting contracts with IP. The cutting contracts, also referred to as "stumpage permits," [21] permitted ILC to obligate third parties to cut and haul timber through conditional licenses. Pursuant to these licenses, third-party contractors would deliver the cut timber to destinations predetermined by IP. ILC did not sell or purchase any timber except that subject to its cutting contracts with IP.

During the years in issue, 1973 through 1979, ILC's payments under the cutting contracts were due only for timber actually cut and measured. If payments were due ILC from third-party purchasers under parallel contracts, such payments were due IP only upon the performance of the third-party's duty to pay ILC. IP was not paid in advance of the timber harvest. When payments to IP were made by ILC, they were made solely by bookkeeping entries.

IP recognized gains under its cutting contracts with ILC by subtracting the depletable basis in the timber from the amount realized. IP recognized and reported these gains as long-term capital gain from the § 631(b) timber dispositions as follows:

| TAX YEAR | IP's REPORTED § 631(b) GAIN |
| --- | --- |
| 1973 | $ 269,016 |
| 1974 | 253,943 |
| 1975 | 1,521,881 |
| 1976 | 1,554,585 |
| 1977 | 2,128,779 |
| 1978 | 3,225,421 |
| 1979 | 2,686,797. |

21. "Stumpage" is defined as: "1. Standing timber regarded as a commodity. 2. The value of standing timber. 3. The right to cut standing timber." *Webster's II, New Riverside University Dictionary* 1151 (1984). The parties' Joint Stipulation Of Fact indicates that the stumpage permits entered into by IP and ILC granted ILC "the right to enter on [IP's] premises and cut and haul therefrom specified board feet of ... timber." Jt. Stip. ¶ 61.

Jt. Stip. ¶ 73. The parties agree that IP's gains under the cutting contracts were subject to § 631(b) capital gains treatment.

During the time at issue, however, ILC did not report any gain or loss under the cutting contracts and, moreover, it did not capitalize any amounts paid to IP under the contracts. ILC and IP did not actually claim, nor were they entitled to claim, depreciation or amortization deductions pursuant to the timber transfers under the cutting contracts. On the other hand, while neither party claimed depletion, the Internal Revenue Service, through audit of ILC and IP, determined that ILC was required to capitalize its payments to IP under the logging contracts, and thus, defendant characterizes such timber transfers as "deferred intercompany transactions" involving property subject to depletion. In view of such circumstance, defendant recharacterized IP's § 631(b) capital gains as ordinary income on IP's consolidated federal income tax returns for each of the years 1973 through 1979.

### B. *Contentions of the Parties*
#### 1. *Defendant*

Defendant contends that by transferring cutting rights to ILC in exchange for payment under the cutting contracts, IP made a § 631(b) disposition of its timber at the same time it transferred an interest in timber to ILC sufficient to require ILC to capitalize its payments. The government asserts, therefore, that pursuant to Treas.Reg. § 1.1502–13(a)(2)(iii), ILC incurred an expenditure where the amount should be capitalized, thereby qualifying the intercompany transactions under the cutting contracts as "deferred intercompany transactions" pursuant to Treas.Reg. § 1.1502–13(a)(2). In addition, defendant alleges that the timber exchanged for the capitalized payments is subject to depletion deductions by ILC under Treas. Reg. § 1.611–3(b), and, therefore, the consolidated return regulations mandate a recharacterization of IP's capital gains realized on the transfers pursuant to Treas.Reg. § 1.1502–13(c)(4)(ii).

In sum, therefore, defendant concludes that the requirements set forth in Treas.Reg. § 1.1502–13(a) are satisfied, and IP must recharacterize its capital gain realized pursuant to its § 631(b) timber dispositions as ordinary income pursuant to Treas.Reg. § 1.1502–13(c)(4)(ii).

#### 2. *Plaintiff*

Conversely, plaintiff disputes that ILC ever obtained an "economic interest" in the timber transferred pursuant to its leases with IP sufficient to claim depletion deductions. While admitting that ILC had legal title to the logs harvested, plaintiff, nonetheless, avers that IP retained all economic interest in the timber. Thus, plaintiff asserts two conclusions: (i) no sale occurred under the contracts between ILC and IP; and (ii) ILC was not required to capitalize its payments to IP and claim a depletion deduction with respect to the timber. As a result, plaintiff contends that its timber transactions do not qualify as "deferred intercompany transactions" and the requirements for income recharacterization pursuant to Treas. Reg. § 1.1502–13(c)(4)(ii) have not been met. Accordingly, plaintiff asserts that its income derived from the timber dispositions under its contracts with ILC for the years in issue was correctly reported as capital gain pursuant to § 631(b) and, therefore, should not be recharacterized as ordinary income under the consolidated return regulations. We next address those requirements in turn.

### C. *Discussion*

Pursuant to the I.R.C. and the Treasury Regulations promulgated thereunder, members of an affiliated group of corporations are permitted to file a consolidated federal income tax return. 26 U.S.C. §§ 1501–1504. Through this procedure, the losses of a corporation may offset the income of an affiliated corporation. Nonetheless, the taxable income of each member, at the threshold, is calculated as if each member had filed separate tax returns and had engaged in transactions with unrelated taxpayers. Treas.Regs. §§ 1.1502–11(a) and 1.1502–12.

Treas.Reg. § 1.1502–13 governs the appropriate federal tax treatment of "intercompany transactions" engaged in by and between members of an affiliated group. Where a property transfer between members of an

affiliated group meets certain special criteria, the transaction qualifies as a "deferred intercompany transaction." Treas.Reg. § 1.1502–13(a)(2). Taxable recognition of gain or loss realized through a deferred intercompany transaction is deferred until a "subsequent restoration event." Treas.Regs. §§ 1.1502–13(c), (d) and (f).[22]

If three requirements are satisfied, however, the transferor corporation must recognize the deferred capital gains (or losses) as ordinary income (or loss). Treas.Regs. §§ 1.1502–13(c)(4)(ii) and (d)(1).[23] That is, the transferor corporation's deferred income is "recharacterized," thus requiring a different tax treatment. These requirements are:

(i) the members engaged in a "deferred intercompany transaction;"

(ii) the property acquired in the transaction is subject to depreciation, depletion, or amortization; and

(iii) the fraction for determining the proportion of capital gain to be recharacterized as ordinary income may not be zero.

Treas.Reg. § 1.1502–13(d)(1).

Defendant contends that the timber transfers made pursuant to the cutting contracts between IP and ILC satisfy these requirements, and as a result, Treas.Reg. § 1.1502–13(c)(4)(ii) mandates that IP's capital gains recognized thereunder must be recharacterized as ordinary income. Plaintiff, of course, disputes this, arguing that its gain recognized under the contracts is properly characterized under § 631(b) as capital gain.[24] We review the recharacterization requirements seriatim with respect to the timber transactions performed between ILC and IP pursuant to their cutting contracts.

### 1. Deferred Intercompany Transaction

Addressing the first of the three prongs required for income recharacterization under the consolidated return regulations, we examine whether the affiliated members engaged in a deferred intercompany transaction. To qualify as a "deferred intercompany transaction," the transaction must involve either (i) a sale or exchange of property; (ii) the performance of services where the amount of the expenditure is capitalized; or (iii) any other expenditure where the amount of the expenditure is capitalized. Treas.Reg. § 1.1502–13(a)(2).

### a. Did IP And ILC Engage In A Sale or Exchange Of Property And Thus Perform A "Deferred Intercompany Transaction?"

26 U.S.C. § 1231 provides that gains from the sale of "property used in the

22. A subsequent restoration event includes—a sale of the transferred asset outside of the affiliated group; a withdrawal from the affiliated group by the buyer or the seller of the transferred asset, or; the allowance of depreciation, depletion, or amortization deductions to the acquiring member, with respect to the transferred asset. Treas. Regs. §§ 1.1502–13(f)(1)(i), (iii) and 1.1502–13(d).

23. Except as provided in subsection (c)(4)(ii) of Treas.Reg. § 1.1502–13, subsection (c)(4)(i) of that regulation provides that "the character and source of deferred gain or loss on a deferred intercompany transaction shall be determined at the time of the ... transaction." § 1.1502–13(c)(4)(i). Treas.Reg. § 1.1502–13(c)(4)(ii), however, states:

(4) Character and source of deferred gain or loss.... (ii) Deferred gain or loss taken into account by the selling member under paragraph (d)(1) of this section, or (as a result of abandonment) under paragraph (f) of this section, shall be treated as ordinary income or loss.

In turn, Treas.Reg. § 1.1502–13(d)(1) provides, in part:

(d) Restoration of deferred gain or loss of property subject to depreciation, amortization, or depletion—(1) General rule. (i) If property (including a capitalized expenditure for services, or any other capitalized expenditure) acquired in a deferred intercompany transaction is, in the hands of any member of the group, subject to depreciation, amortization, or depletion, then, for each taxable year (whether consolidated or separate) for which a depreciation, amortization, or depletion deduction is allowed to any member of the group with respect to such property, a portion ... of the deferred gain or loss attributable to such property shall be taken into account by the selling member. * * * "

24. Section 631(b) provides, in part: "In the case of the disposal of timber held for more than 6 months before such disposal, by the owner thereof under any form or type of contract by virtue of which such owner retains an economic interest in such timber, the difference between the amount realized from the disposal of such timber and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber. * * * " 26 U.S.C. § 631(b).

trade or business," including timber "with respect to which section 631 applies," shall be treated as long-term capital gain if such gains exceed similar losses.[25] § 1231(a), (b)(1) and (b)(2). Section 631(b) allows an owner of timber to recognize capital gains treatment where the owner has disposed of standing timber or cutting rights and has retained an economic interest in the timber.[26] 26 U.S.C. § 631(b); *Ray v. Commissioner*, 32 T.C. 1244, 1250–51, 1959 WL 1241 (1959) (discussing § 117(k)(2) of the 1939 I.R.C., the predecessor statute of § 631(b)), *aff'd*, 283 F.2d 337 (5th Cir.1960) (*per curiam*). Although they are treated as a "sale or exchange" for federal income tax purposes, all § 631(b) dispositions are not sales or exchanges. For example, a § 631(b) disposition may qualify as a lease. *See Boeing v. United States*, 121 Ct.Cl. 9, 24–25, 98 F.Supp. 581, 583–84 (1951). But, where a taxpayer has engaged in a § 631(b) disposition as well as a "sale or exchange of property," the Treasury Regulations qualify the transaction as a "deferred intercompany transaction." Treas.Reg. § 1.1502–13(a)(2)(i).

Here, the parties do not dispute that the disposal of timber cutting rights by IP was properly subject to § 631(b) capital gain treatment.[27] IP avers, however, that it disposed of its standing timber by transferring its cutting rights to ILC under a lease, and it did not engage in a "sale or exchange of property" with ILC. Rather, IP argues, it sold its timber harvested by ILC under the cutting contracts to itself and third parties "through ILC" pursuant to log sales agreements executed between ILC and third parties. Conversely, defendant primarily contends that ILC was required to capitalize its payments made to IP pursuant to their cutting contracts as a result of ILC's log sales agreements, through which ILC ultimately disposed of the timber for money. Defendant alternatively asserts, through a footnote, that ILC and IP engaged in a "sale or exchange" of timber under Treas.Reg. § 1.1502–13(a)(2)(i).[28] Because we find that the timber transactions constitute "deferred intercompany transactions" based on the government's primary basis for that assertion, *i.e.*, that ILC's payments under the cutting contracts are required to be capital-

---

**25.** Plaintiff does not assert that IP engaged in a sale or exchange of a "capital asset" within the meaning of § 1221, upon which it must recognize capital gains and losses under § 1222 of the I.R.C. The definition of a "capital asset" does not include "property held by the taxpayer primarily for sale to customers in the ordinary course" or "real property used in his" trade or business, §§ 1221(1) & (2).

**26.** Thus, even if the timber owner transfers its cutting rights to harvest the timber for "sale to customers in the ordinary course of his trade or business," thus, falling outside the scope of § 1221, the owner may nonetheless recognize capital gain treatment on the disposal under § 631(b). Treas.Reg. § 1.631–2; *Dyal v. United States*, 342 F.2d 248, 251 (5th Cir.1965); *Ah Pah Redwood Co. v. Commissioner*, 251 F.2d 163, 166 n. 6 (9th Cir.1957).

In contrast, if timber owners do not transfer their cutting rights and cut their own timber for a later sale of the timber, they may elect to treat the cutting of timber as a "sale or exchange" pursuant to § 631(a), but not § 631(b). *Dyalwood, Inc. v. United States*, 588 F.2d 467, 469 (5th Cir.1979); *see Ray v. Commissioner*, 32 T.C. at 1250–51. To receive § 631(a) treatment, an owner must make a permanent election under this section, which is not required under § 631(b), and this election may be avoided only upon a showing of undue hardship. *Dyalwood,*

588 F.2d at 469. Section 631(a), moreover, is mutually exclusive of the timber owner's invocation of § 631(b). *Id.*

**27.** To qualify for capital gains treatment under § 631(b), "1. the taxpayer must be an 'owner' of the timber; 2. he must make a 'disposal' of it under a contractual arrangement by which he retains an economic interest in it; and 3. the taxpayer must have held the timber for more than six months [now one year] prior to the disposal." *Barclay v. United States*, 166 Ct.Cl. 421, 428, 333 F.2d 847, 852 (1964); *see also Superior Pine Prod. Co. v. United States*, 201 Ct.Cl. 455, 480, 1973 WL 21339 (1973), *cert. denied*, 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973).

**28.** Defendant states, "the Government has asserted that the transactions in question qualify as deferred intercompany transactions *not* because they are sales or exchanges of property (Regulations § 1.1502–13(a)(2)(i)), but because the amount is required to be capitalized and depleted by the related transferor, ILCO (Regulations § 1.1502–13(a)(2)(iii)). *Moreover, plaintiff's position was rejected in Georgia–Pacific, supra, 648 F.2d [653,] p. 656 [9th Cir.1981] ("We hold that the transactions in the present case were 'sales' ...").*" Defendant's Cross–Motion For Partial Summary Judgment, filed February 28, 1992 (Def.Br.), p. 39, n. 22 (emphasis added).

ized, as discussed *infra*, we need not address the issue of whether a sale or exchange of timber took place.[29]

b. *Did ILC Make An Expenditure Where The Amount Of The Expenditure Was Required To Be Capitalized, And Thus Perform A "Deferred Intercompany Transaction?"*

If money paid by a corporation to an affiliate is capitalized, the intercompany transaction is "deferred." Treas.Reg. § 1.1502–13(a)(2)(iii). Defendant asserts that Treas. Reg. § 1.631–2(e)(1) operates to *require* capitalization of ILC's payments made pursuant to its cutting contracts with IP. Specifically, this section provides that—

> Amounts paid by the lessee for timber or the acquisition of timber cutting rights, whether designated as such or as a rental, royalty, or bonus, *shall* be treated as the cost of timber and *constitute part of the lessee's depletable basis of the timber*, irrespective of the treatment accorded such payment in the hands of the lessor.

Treas.Reg. § 1.631–2(e)(1) (emphasis added).[30]

Defendant contends, given the foregoing, that the language of Treas.Reg. § 1.631–2(e)(1) is patently clear and, thus, where a lessee such as ILC acquires timber cutting rights under a lease, it must treat such payments as part of the depletable basis in the timber, regardless of the tax treatment of the lessor (IP). On the other hand, plaintiff argues that ILC was *not* required to capitalize its payments under the cutting contracts, for the reason that this regulation is applicable *only* to lessees who are "owners" of timber entitled to capital gain treatment under § 631(b). Plaintiff rests its argument on the construction of Treas.Reg. § 1.631–3(b)(3)(ii)(a), which is parallel in construction to Treas.Reg. § 1.631–2(e)(1) at issue here. The former regulation, relied on by plaintiff, provides that *where a lessee is also a sublessor and is considered an "owner" of the coal*

for purposes of § 631(c) dispositions, all "[r]ents and royalties paid with respect to coal or iron ore disposed of by such a lessee under section 631(c) shall increase the adjusted depletion basis of the coal or iron ore and are not otherwise deductible." Treas. Reg. § 1.631–3(b)(3)(ii)(a); *see Davis v. Commissioner*, 746 F.2d 357, 361 (6th Cir.1984). Thus, this regulation relied on by plaintiff and applicable to iron ore and coal lessees applies *only* to lessees who seek capital gains treatment under § 631(c) as a sublessor under the coal or iron ore lease.

 The parallel Treasury Regulation, § 1.631–2(e)(1), quoted *supra*, applicable to transfers of timber and timber cutting rights under lease arrangements, does not contain similar language restricting its mandate to only those situations where a lessee is seeking capital gains benefits under § 631(b) as a sublessor. Although plaintiff urges this court to read Treas.Reg. § 1.631–2(e)(1) as if it contained the similar restrictive language contained in the coal and iron ore regulation (Treas.Reg. § 1.631–3(b)(3)(ii)(a) above), this court declines the invitation. Moreover, cognizant of the United States Court of Claims' instructions regarding the application of Treas.Reg. § 1.631–2(e)(1) in *Union Bag–Camp Paper Corp. v. United States*, 163 Ct.Cl. 525, 325 F.2d 730 (1963) (*per curiam*), this court is compelled to reject plaintiff's argument. In that case, the Court of Claims stated as follows:

> Obviously, there may be numerous instances in the timber industry where the contract between the buyer of timber and the landowner is denominated by them a "lease" and where the buyer agrees to pay the landowner sums designated in the contract as "rentals." Nonetheless, *if it appears upon examination of the contract that all the "lessee" has acquired thereunder is the "lessor's" timber or the right to cut it, then the regulation [Treas.Reg. § 1.631–2(e)(1)] by its terms is applicable,*

---

**29.** Defendant has not argued that the subject transfers qualify as services pursuant to Treas. Reg. § 1.1502–13(a)(2)(ii).

**30.** The definition of "depletable basis" applicable to timber is contained in Treas.Reg. § 1.611–3(a) and describes the cost basis provided by § 612,

which, in turn, describes an "adjusted basis" provided by § 1011. The adjusted cost basis under § 1011 for determining gain or loss from the sale of property is the cost basis under § 1012 or the adjusted cost basis under § 1016.

*and the "rentals" are properly treated as the cost of timber to the "lessee."*

163 Ct.Cl. at 538, 325 F.2d at 737 (emphasis added). Clearly, in *Union Bag–Camp Paper,* our predecessor court did not express an intent to restrict the application of Treas. Reg. § 1.631–2(e)(1) as proposed now by IP. Therefore, based on the plain terms of Treas. Reg. § 1.631–2(e)(1) and legal precedent, we hold that the restrictive reading of this regulation, as proposed by plaintiff, is without merit, and we must reject it. Accordingly, we further hold that ILC *is* required to capitalize its payments made to IP under its cutting contracts.

Consequently, pursuant to Treas.Reg. § 1.1502–13(a)(2)(iii), the required capitalization of ILC's payments to IP qualifies the timber transfers between these two members of a consolidated group as "deferred intercompany transactions." Treas.Reg. § 1.1502–13(d)(1)(ii). Qualifying as deferred intercompany transactions, the timber transactions between IP and ILC, therefore, satisfy the first of three prongs of the income recharacterization test. Since all three prongs must be satisfied to require IP to recharacterize a portion of its § 631(b) capital gains as ordinary income, the court now turns to evaluate whether the second prong of the test is satisfied, *i.e.,* whether, pursuant to its contracts with IP, ILC acquired property subject to a depletion allowance.

### 2. *Property Acquired Subject To Depletion*

Under a deferred intercompany transaction, *if* property acquired by an affiliate is subject to depreciation, depletion, or amortization, the transferor affiliate must treat a portion of the gain or loss on the transfer as ordinary income for each taxable year a deduction is allowed.[31] Treas.Regs. §§ 1.1502–13(c)(4)(ii) and (d)(1). Section 611 of the

I.R.C. provides that, when standing timber is cut, the owner of the standing timber may recognize the depletion of the capital resource by deducting a certain amount of the depletable basis in the timber from the owner's gross income from timber cutting. Prescribing the circumstances in which a depletion deduction is allowed under § 611, Treas. Reg. § 1.611–1(b)(1) provides, in relevant part, that:

> Annual depletion deductions *are allowed only to the owner of an economic interest* in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital.

Treas.Reg. § 1.611–1(b)(1) (emphasis added).[32] In short, this regulation sets forth a two-pronged test for determining when a taxpayer is allowed to take a depletion deduction in standing timber. First, the taxpayer must own an "economic interest" in standing timber which the taxpayer has "*acquired by investment.*" Second, the taxpayer must derive income from the harvesting of the timber from which the taxpayer seeks a return of capital. This test, originally set forth by the U.S. Supreme Court in *Palmer v. Bender,* 287 U.S. at 557, 53 S.Ct. at 226, has been consistently employed in subsequent depletion cases respecting both oil and mineral deposits and standing timber. *Georgia–Pacific Corp. v. United States,* 648 F.2d 653, 657–58 (9th Cir.1981) (timber depletion); *Food Machinery and Chemical Corp. v. United States,* 172 Ct.Cl. 313, 322–23, 348 F.2d 921, 926 (1965) (oil depletion).

Defendant contends that ILC's transactions with IP under the cutting contracts satisfied the two-pronged "economic interest

---

**31.** It is mutually stipulated that neither IP nor ILC was entitled to claim depreciation or amortization allowances with respect to the timber transferred. Jt. Stip. ¶ 78.

**32.** This regulation parallels the United States Supreme Court's interpretation of the predecessor statute of § 611 as applied to oil leases. *Palmer v. Bender,* 287 U.S. 551, 557, 53 S.Ct. 225, 226,

77 L.Ed. 489 (1933). There, the Court stated that "[t]he language of the statute is broad enough to provide, at least, for every, case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures by any form of legal relationship, income derived from the extraction of oil, to which he must look for a return of his capital." *Id.*

test" of Treas.Reg. § 1.611–1(b)(1), thereby qualifying ILC for depletion deductions under the regulations.[33] First, defendant asserts that ILC acquired an interest in standing timber by capital investment when it executed the cutting contracts and acquired the timber from IP. ILC's capital investment was made, allegedly, by assuming the obligation under the contracts to pay IP for the timber when harvested. Second, defendant avers that ILC looked to the income derived from exercising its cutting rights granted under the contracts for the subsequent disposition of the timber to third parties under ILC's log sales agreements and consequent return of its investment.

Plaintiff, on the other hand, argues that ILC did not acquire an economic interest in the timber, but merely, and primarily, served superficially to facilitate a "pass through" pricing arrangement and to insulate it (IP) from excessive tort liability in Canada. Plaintiff asserts that ILC could *not*, in fact, have obtained an economic interest in the standing timber because ILC was contractually bound to dispose of the timber according to the explicit instructions of IP and, thus, was *not* free to look to the open market to sell the timber for its own account. Accordingly, plaintiff argues, ILC obtained merely an "economic advantage" rather than an "economic interest" in the timber pursuant to *Palmer v. Bender*, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933), and Treas.Reg. § 1.611–1(b).

In *Georgia–Pacific*, the United States Court of Appeals for the Ninth Circuit addressed whether, pursuant to a timber cutting contract between Georgia–Pacific and its wholly owned subsidiary, the subsidiary acquired an "economic interest" sufficient to entitle it to depletion deductions in the transferred timber. Under the timber cutting contract, the subsidiary agreed to cut a cer-

tain amount of timber on Georgia–Pacific's property and pay Georgia–Pacific $150 for each thousand board feet cut. 648 F.2d at 654. The timber cutting contract, moreover, designated the subsidiary as "buyer" and the parent as "seller." *Id.* at 654, 656. Payment was required, however, only upon the subsidiary's removal of the timber and, at that time, title to the timber passed to the subsidiary. *Id.*

As in the present case, the parent corporation, Georgia–Pacific Corp., recognized capital gains on the disposal of the standing timber pursuant to § 631(b), and the Internal Revenue Service sought to apply Treas.Reg. § 1.1502–13(c)(4) to recharacterize those gains as ordinary income. *Id.* at 654. The Ninth Circuit held for the government, finding that the parties engaged in a "deferred intercompany transaction" whereby the subsidiary acquired a sufficient economic interest in the timber to entitle the subsidiary to depletion deductions in the timber. *Id.* at 659. In so holding, the Ninth Circuit distinguished an "economic interest" from a "pecuniary advantage" stating:

> The Supreme Court has held that a mineral lessee has an economic interest in the minerals and is entitled to claim depletion *if* the lessee looks to the sale of the minerals in the open market for its return. *See Commissioner v. Southwest Exploration Co.*, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed 347 (1956); *Palmer v. Bender*, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933). Where the lessee *is required* to sell the minerals removed to the lessor at a predetermined price and *does not look to the sale in the open market for its return,* however, *the lessee does not* have an economic interest and may not claim depletion.

*Id.* at 658 (citations omitted and emphasis added).[34] In determining whether a lessee

---

**33.** It is undisputed that because IP chose to recognize capital gains on the disposal of the timber pursuant to § 631(b), IP was not entitled to depletion deductions in the timber as stated in Treas.Reg. § 1.611–1(b)(2). Pl. Br. at 27; Def. Br. at 36 n. 19.

**34.** Similarly, the regulations distinguish such an "economic interest" from an "economic advantage," the latter being insufficient to allow the

taxpayer to take a depletion deduction, as follows:

> [A] person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production.

"looks to the sale of the resource in the open market for its return," the Ninth Circuit turned to its previous analysis employed in *United States v. Giustina*, 313 F.2d 710 (9th Cir.1962), which it had employed to determine whether a taxpayer constituted an "owner" of the timber within the meaning of the statutory predecessor to § 631(b). *Georgia–Pacific*, 648 F.2d at 658–59. The court there explained that "whether the purchaser looks primarily to sale in the open market for its return is the functional equivalent of the investment opportunity and risk test of *Giustina*." [35] *Id.* at 659.

Based on the facts in *Georgia–Pacific*, the Ninth Circuit found that, as in *Giustina*, the contracts between Georgia–Pacific and its subsidiary provided for "the purchase of a specified amount of timber at a predetermined price. The purchasers [were] thus able to sell the timber in the open market and possess the investment opportunity and risk of ownership." *Id.* at 658–59. Therefore, in these circumstances, the lessee acquired an "economic interest" in the timber sufficient to entitle it to depletion deductions. The court emphasized, moreover, that "[e]ven a minor opportunity to sell in the market is enough to give a timber cutter an economic interest in the timber." [36] *Id.* (citing *Thornberry Construction Co. v. United States*, 217 Ct.Cl. 196, 576 F.2d 346 (1978)).

*At first blush*, application of the foregoing analysis in *Georgia–Pacific*, which somewhat

mirrors the present case, *would appear* to support the existence of an "economic interest" held by ILC in the timber transferred pursuant to its cutting contracts with IP. This is so because ILC transferred the timber cut and hauled the timber from IP's property to third-party purchasers who made payments to ILC pursuant to parallel cutting contracts and log sales agreements. Therefore, it blandly appears that ILC possessed an investment opportunity and risk under the cutting contracts to sell the timber to third parties in the open market, thereby conferring on it (ILC) an "economic interest" in the timber.

▪ Upon a closer examination of the stipulated facts, however, the present case is distinguishable from *Georgia–Pacific*. Here at bar, ILC received payments from third parties for the transfer of timber, but those payments were not the product of sales by ILC in the open market. Rather, the indisputable facts establish that, *prior* to executing the cutting contracts with ILC, IP had determined *where and to whom* ILC would deliver the timber. Specifically, the parties have agreed in the explicit joint stipulations [37] that:

> 48. At all times throughout the years at issue, International exercised complete control over ILC.
>
> \* \* \* \* \* \*

which is not at issue here, it does not necessarily follow that *ILC* obtained an "economic interest" in the timber sufficient to claim depletion deductions where it does not claim § 631(b) benefits.

---

Treas.Reg. § 1.611–1(b)(1); *see also Helvering v. Bankline Oil Co.*, 303 U.S. 362, 367, 58 S.Ct. 616, 618, 82 L.Ed. 897 (1938); *Huntington Beach Co. v. United States*, 132 Ct.Cl. 427, 132 F.Supp. 718 (1955), *aff'd*, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956).

**35.** The *Georgia–Pacific* court explained that in *Giustina* the court held that the lessee qualified as an "owner" of the timber "because it had the right to sell the timber for its own account in the open market and thus possessed the investment opportunity and risk of ownership." *Georgia–Pacific*, 648 F.2d at 658. The court stated that the investment opportunity and risk test espoused by *Giustina* is more stringent than the current test for determining who constitutes an "owner" of timber within the meaning of § 631(b). *Id.* at 659 n. 10. Thus, the court asserted that the "more stringent test" set forth in *Giustina* "conforms to the test for 'economic interest' established by the Supreme Court." *Id.* Therefore, even if ILC qualified as an "owner" of the timber within the meaning of § 631(b),

**36.** Whether or not a taxpayer has acquired legal title to the property is not a prerequisite for finding that the taxpayer has acquired by investment an "economic interest" in it. *Kirby Petroleum Co. v. Commissioner*, 326 U.S. 599, 603, 66 S.Ct. 409, 411, 90 L.Ed. 343 (1946). Nor is a direct monetary investment in the depletable property required. *Commissioner v. Southwest Exploration Co.*, 350 U.S. at 312, 76 S.Ct. at 397.

**37.** The term "stipulation" is defined as "The name given to ... [a] [v]oluntary agreement between opposing counsel concerning disposition of some relevant point so as to obviate need for proof or to narrow range of litigable issues." *Black's Law Dictionary* 1269 (5th ed. 1979).

*53. ... International controlled ILC's disposition of the timber subject to the cutting contracts, and ILC had no independent control over the disposition of the timber subject to the cutting contracts. International made all disposition determinations prior to the time a cutting contract was executed with ILC.*

Jt. Stip. ¶¶ 48, 53 (emphasis added). In fact, during 1973 through 1979, "... ILC disposed of the harvested materials pursuant to log and pulpwood sales agreements.... The logs and pulpwood were delivered as predetermined by International either to an International facility in the United States, to CIP [IP's wholly owned Canadian subsidiary], or to unrelated Canadian purchasers." Jt. Stip. ¶ 65. The contracts between ILC and third parties specified a price per unit of timber that was the same price per unit of timber ILC was obligated to pay IP under the parallel cutting contracts. Thus, *unlike* the subsidiary in *Georgia–Pacific*, ILC was unalterably *obligated* to transfer the timber cut and hauled under the cutting contracts *to third parties predetermined by IP and at a fixed price established by IP*. The fixed price received by ILC was then remitted by ILC directly and in full to IP.

Examining the second element required for a finding of an "economic interest," this court finds that ILC did not look to the severance of the timber for a return on a capital investment in the timber. Finding that taxpayers failed to meet this prerequisite for obtaining an "economic interest" in coal, the U.S. Supreme Court examined seven elements of the parties' contract mining transactions in *Paragon Jewel Coal Co. v. Commissioner*, 380 U.S. 624, 85 S.Ct. 1207, 14 L.Ed.2d 116 (1965), and *Parsons v. Smith*, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959). These elements are:

(1) that [the contract miners'] investments were in their equipment, all of which was movable—not in the coal in place; (2) that their investments in equipment were recoverable through depreciation—not depletion; (3) that the contracts were completely terminable without cause on short notice; (4) that the landowners did not agree to surrender and did not actually surrender to [the contract miners] any capital investment in the coal in place; (5) that the coal at all times, even after it was mined, belonged entirely to the landowners, and that [the contract miners] could not sell or keep any of it but were required to deliver all that they mined to the landowners; (6) that [the contract miners] were not to have any part of the proceeds of the sale of the coal, but, on the contrary, they were to be paid a fixed sum for each ton mined and delivered ...; and (7) that [the contract miners], thus, agreed to look only to the landowners for all sums to become due them under their contracts.

*Paragon Coal*, 380 U.S. at 633–34, 85 S.Ct. at 1212, quoting *Parsons*, 359 U.S. at 225, 79 S.Ct. at 663. These elements were reviewed by the U.S. Court of Claims, under facts similar to those presented in the case at bar, in *Thornberry*, 217 Ct.Cl. at 206–10, 576 F.2d at 352–54; *see also Georgia–Pacific*, 648 F.2d at 658 (explaining and distinguishing *Paragon Coal* and *Parsons*).

In *Thornberry*, the lessor, American Metal Climax, Inc. (AMAX), had an agreement with a coal broker, Mr. Thomas W. Talbert, to sell particular types and quantities of coal. Mr. Talbert had an order to fill for the Dairyland Power Cooperative, which required a specific quality of coal. 217 Ct.Cl. at 199–200, 576 F.2d at 348–49. AMAX could provide this certain level of coal quality only upon mixing its then current production from its Ayrgem Mine with the coal from another mine, referred to as No. 9. 217 Ct.Cl. at 200, 576 F.2d at 349. Previously, AMAX had determined that it was not "economically practical or feasible" to mine the No. 9 coal seam itself. *Id.;* 576 F.2d at 349. Consequently, AMAX's president informed Thornberry that it was interested in leasing the mine to one who would sell a sufficient amount of the coal to Mr. Talbert to upgrade the Ayrgem coal. 217 Ct.Cl. at 201, 576 F.2d at 349. AMAX's president "told Thornberry he was sure Mr. Thornberry would be able to sell coal to Mr. Talbert on the basis of a fair deal, and that if Mr. Thornberry would 'work out something' with Mr. Talbert, AMAX would lease the No. 9 coal to Mr. Thornberry." *Id.;* 576 F.2d at 349. After meeting with Mr. Talbert, Mr. Thornberry decided that he "could profitably

operate a mine based on what Mr. Talbert indicated he was willing to pay for No. 9 coal at that time." *Id.;* 576 F.2d at 349. AMAX was not involved in, nor did it know, the terms of the negotiations and agreement between Mr. Talbert and Mr. Thornberry. 217 Ct.Cl. at 201–02, 576 F.2d at 349.

On the same day that Mr. Talbert and Mr. Thornberry entered into their agreement to buy and sell coal, AMAX executed a two-year lease with James R. Thornberry.[38] Pursuant to the lease, Thornberry was obligated to pay AMAX 75 cents per ton of No. 9 coal "mined, removed, and sold from the leased premises." 217 Ct.Cl. at 202, 576 F.2d at 350. AMAX treated the royalty payments received from Thornberry as § 631(c) capital gains. 217 Ct.Cl. at 209–10, 576 F.2d at 354. The Court of Claims found that Thornberry as the lessee had an "economic interest" in coal entitling it to depletion deductions, stating that—

> The lease and assignment conferred upon plaintiff the rights to mine coal and to sell that coal, at whatever price it could obtain therefor, to an independent, unrelated, third party (albeit a valued customer of AMAX), and not to AMAX itself. Put another way, plaintiff was not simply extracting coal for AMAX under a contract with AMAX from which it derived a pecuniary advantage, but was mining coal for sale to a third party, at an independently determined price, and was required to look to the extraction of that coal and the sale thereof for a return on its investment and profit.

217 Ct.Cl. at 209, 576 F.2d at 353. Reaching this conclusion, the court pointed out that AMAX had no objection to Thornberry's sale of the coal to buyers other than Mr. Talbert if Mr. Talbert did not require it. 217 Ct.Cl. at 209–10, 576 F.2d at 354. Also, AMAX did not retain any control over Thornberry's management or mining operations. *Id.;* 576 F.2d at 354. Finally, it was AMAX's view that the coal mined belonged to Thornberry. *Id.;* 576 F.2d at 354. Accordingly, the court held that "pursuant to a bona fide, arm's-length legal relationship, [Thornberry] secured income derived from the extraction of coal, and it could and did look solely to the income thus derived for a return of its capital." *Id.;* 576 F.2d at 354.

Conversely, however, the mutually stipulated facts in the present case indisputably establish that ILC *did not* engage in a "bona fide, arm's-length legal relationship" with IP through which it secured an opportunity to cut and haul timber for income.[39] On the contrary, IP's complete control over ILC's management and operations is evident from the parties' agreements included in the parties' joint stipulation as attachments. *See* Jt. Stip. Preamble. For example, on June 25, 1975, ILC's Manager, Mr. Morris R. Wing, and IP's Assistant General Manager, Mr. James B. Carlaw, executed the cutting contracts between IP and ILC.[40] On the same day, these same individuals, Mr. Wing and Mr. Carlaw, executed the parallel ILC and third-party cutting contracts on behalf of ILC as Manager and ILC's duly-authorized president, respectively.[41] Unlike AMAX, IP had complete control over all of ILC's management and operations and directed ILC's dispositions of timber, thereby precluding ILC from making independent dispositions of

---

**38.** Mr. James R. Thornberry subsequently assigned all of his rights under the lease to his son, Mr. James M. Thornberry, sole shareholder and manager of Thornberry Construction Company. 217 Ct.Cl. at 203, 576 F.2d at 350.

**39.** Moreover, the *Thornberry* court stated that Thornberry's capital investment was clearly made when Thornberry "made substantial expenditures in connection with mining and selling the coal" including "mining engineering expenses, equipment costs, expenses of construction of a haul road and stockpile, the costs of relocating a cemetery entrance road and a county road, and the costs of a strip mining permit and a reclamation bond." 217 Ct.Cl. at 208, 576

F.2d at 353. Here, however, during the years 1973 through 1979, ILC had only a few clerks and timber scalers who performed ministerial functions. IP's full-time staff served as ILC officers and employees who performed only administrative functions. Thus, ILC did not make any investments resembling the capital investments made by Thornberry.

**40.** This stumpage permit was included in the parties' joint stipulation of fact as an attachment, pp. 1000001–1000004.

**41.** This third-party stumpage permit was included in the parties' joint stipulation of fact as an attachment, pp. 1000005–10000012.

said timber. As a result of IP's complete and unfettered control over ILC's dispositions, ILC was required to dispose of the timber at IP's direction and, thus, constructively disposed of the timber directly to IP. ILC was, therefore, not able to freely dispose of the timber in the open market for its own account.

In addition, unlike AMAX's disposition of coal to Thornberry, the facts indicate that IP did not view ILC as the owner of the timber. IP retained title to the timber until the timber was cut and all sums were paid. The third-party purchasers were required by the log sales agreements to pay for the timber before it was removed from IP's premises. ILC "did not retain any logs under the cutting contracts for any purpose," nor did it process any of the timber. Jt. Stip. ¶ 57. IP required payment for the timber from ILC only upon ILC's receipt of payment from third parties who were obligated to pay ILC for the timber. Moreover, all payments made by third-party purchasers under ILC's parallel cutting contracts were equal to what ILC paid other third parties to cut and haul the timber, plus stumpage rates charged by IP. In fact, ILC did not report gain or loss with respect to IP's timber dispositions. ILC was required to pay only for that timber cut and scaled under its cutting contracts with IP. There is no indication in this case that ILC shared in the return of IP's capital investment in the standing timber, but only that IP engaged in a contractual relationship with ILC to dispose of the timber at a predetermined price that was, in turn, due IP. In other words, the loss or destruction of the timber stands after ILC entered into its cutting contracts with IP would not have resulted in a loss to ILC. *See Palmer v. Bender,* 287 U.S. at 558, 53 S.Ct. at 227. Thus, although the timber represented a reservoir of capital investment to IP, IP did not surrender a capital interest in the standing timber to ILC. Therefore, although the parties "did not memorialize in writing their *pass through pricing arrangement,*" Jt. Stip. ¶ 59, the terms of the parties' transactions show that IP intended to use ILC merely as an intermediary and shield against excessive tort liability and not as a bona fide transferee of ownership in timber.

According to the foregoing stipulated facts, therefore, the parties have stated their agreement so as to obviate the need for trial on the issue of whether ILC had the opportunity to freely dispose of the timber in the market place during the years 1973 through 1979. The indisputable material facts clearly show that ILC did not have an investment opportunity or assume risk in the sale of timber in the open market. Therefore, we hold that ILC's interest in the timber did not rise to the level of an "economic interest" as defined in the governing case law, the I.R.C., and the Treasury Regulations and, thus, ILC's interest could only be characterized as a mere "economic advantage." Accordingly, ILC was not entitled to claim depletion deductions for the timber under Treas.Reg. § 1.611–1(b)(1).

3. *The Fractional Formula For Determining The Portion Of IP's Capital Gain To Be Recharacterized As Ordinary Income Cannot Be Zero*

Treas.Reg. § 1.1502–13(d)(1)(ii) sets forth the amount of the deferred gain which shall be taken into account by the selling member, in a deferred intercompany transaction, when the property becomes subject to a depletion deduction, as follows:

(ii) The portion of the deferred gain or loss attributable to any property which shall be taken into account by the selling member shall be an amount equal to—(a) The amount of gain or loss deferred by the selling member at the time of the deferred intercompany transaction ... multiplied by (b) a fraction, the *numerator of which is the amount of the ... depletion deduction* with respect to such property *allowed to any member of the group for the year ...* and the denominator of which is the depreciable basis. ...

From the foregoing, it is evident that, to recharacterize the seller's capital gain income to ordinary income, this fraction cannot be zero. This is the third of three prongs with respect to which all must be satisfied in order to recharacterize IP's capital gains under the consolidated return regulations.

In light of our holding above that ILC did not acquire an "economic interest" in the timber sufficient to entitle it to depletion deductions, it is unnecessary to resolve this issue to reach a conclusion that IP is not required to recharacterize its § 631(b) capital gains as ordinary income. Nonetheless, inasmuch as ILC is not entitled to a depletion deduction, this court notes that in this case the numerator in the above fraction is necessarily zero, thereby making the entire fraction zero.[42] Therefore, since the third element is also not met, we hold that no portion of IP's capital gains recognized pursuant to § 631(b) must be recharacterized as ordinary income.

4. *The Congressional Purpose Underlying The Consolidated Federal Income Tax Return Regulations Would Be Frustrated By The Application Of The Regulations' Recharacterization Provisions Under the Facts Of This Case*

This court concludes by noting that the foregoing analysis and interpretation of Treas.Regs. §§ 1.1502–13(c)(4)(ii) and (d)(1) support the underlying purpose of the consolidated federal income tax return regulations. The consolidated federal income tax return regulations have been implemented by the Secretary pursuant to authority granted by Congress through I.R.C. § 1502, which states:

> The Secretary shall prescribe such regulations he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group ... may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

26 U.S.C. § 1502. Accordingly, pursuant to § 1502, the "overriding objective[s] of the rules and regulations governing the filing of consolidated Federal income tax returns" are to (i) "clearly reflect the income tax liability and the various factors necessary for the determination of such liability, and" (ii) "to prevent avoidance of such tax liability," *Wyman–Gordon Co. and Rome Industries, Inc. v. Commissioner,* 89 T.C. 207, 216, 1987 WL 42564 (1987); *Georgia–Pacific,* 648 F.2d at 655. Regulations implemented pursuant to this congressional grant of authority are considered legislative in nature and have the "force and effect of law." *American Standard, Inc. v. United States,* 220 Ct.Cl. 411, 602 F.2d 256, 260 (1979); *Coca–Cola Bottling Co. of Baltimore v. United States,* 203 Ct.Cl. 18, 26, 487 F.2d 528, 532 (1973) (citing *Brewster v. Gage,* 280 U.S. 327, 50 S.Ct. 115, 74 L.Ed. 457 (1930), and *Lucas v. American Code Co.,* 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 (1930)).

Pursuant to Treas.Regs. §§ 1.1502–13(c)(4)(ii) and (d)(1), when an affiliated seller's asset becomes subject to a depletion deduction in the hands of an acquiring affiliate, the affiliated seller must include in ordinary income a portion of the previous capital gains realized, but deferred, on the original transaction. This portion of capital gains is calculated as a percentage of the property's basis which has been allowed as a depletion deduction. Therefore, the purchasing affiliate's benefit in acquiring a depletable asset from another affiliate is offset by the seller's corresponding cost of including in ordinary income a previously realized, but deferred, gain on the original transaction. This offset is required under the consolidated return regulations so as to preclude corporations from engaging in intercompany transactions so as to multiply and duplicate tax benefits.

In this case, if the consolidated return regulations recharacterize IP's capital gain income realized pursuant to a § 631(b) timber disposition, IP loses this benefit conferred upon timber owners simply because it has chosen to utilize a wholly-owned subsidiary in the transportation of timber abroad for nontax reasons, *i.e.,* limiting its torts liability and enhancing its credit position. Defendant has not alleged or shown that these motives are improper under the I.R.C. or Treasury Regulations. In fact, as assert-

---

42. It is mutually stipulated that neither IP nor ILC claimed a depletion deduction respecting the timber transferred pursuant to the cutting contracts. Jt. Stip. ¶ 77.

ed by plaintiff, IP could have realized capital gains under § 631(b) without utilizing ILC through the cutting contracts. Although IP reported its gain under the cutting contracts as long-term capital gains under § 631(b), ILC did not report any gain or loss with respect to the timber transfers subject to the cutting contracts with IP. It has been stipulated by the parties (Jt. Stip. ¶ 77), moreover, that neither IP nor ILC took a depletion deduction with respect to the timber transfers under the cutting contracts. Therefore, in this case, IP did not realize a tax benefit by using ILC in the cutting contracts that it would not have otherwise realized. In either case, it properly disposed of its timber pursuant to § 631(b) and was, accordingly, entitled to capital gains treatment. There was no multiplication or duplication of tax benefits.

■ Thus, although plaintiff bears the burden of showing that the Commissioner's deficiency notice was issued in error, we fail to see how the application of the consolidated return regulations, under the facts presented here, are necessary to prevent an unfair benefit conferred on plaintiff. Indeed, application of the consolidated return regulations in order to recharacterize IP's § 631(b) capital gains would increase the tax burden of IP that would not have been imposed but for the use of ILC to limit its tort liability. This is an improper application of the Treasury Regulations where, as here, income is clearly reflected. *See Union Carbide Corp. v. United States,* 222 Ct.Cl. 75, 612 F.2d 558, 563 (1979). Accordingly, Treas.Regs. §§ 1.1502–13(c)(4)(ii) and (d)(1), on these indisputable facts, do not require recharacterization of IP's capital gains realized under § 631(b) as ordinary income.

#### D. *Conclusion*

Plaintiff's motion for partial summary judgment, respecting the application of the consolidated federal income tax return regulations to its capital gains realized under § 631(b) pursuant to cutting contracts entered into with its wholly-owned subsidiary, ILC, is hereby GRANTED, and defendant's parallel motion for partial summary judgment on this issue is hereby DENIED.

### CONCLUSION

Based on the foregoing, plaintiff's motion for partial summary judgment addressing issues one, two, and three, *i.e.,* the Contract Purchase Price issue, the DISC issue, and the Consolidated Return issue, is hereby GRANTED. Accordingly, defendant's cross-motion for partial summary judgment respecting the same foregoing issues is hereby DENIED. The record shows that six (6) substantive issues remain for trial on the merits, and the parties have been directed to proceed in accordance with the order filed April 6, 1995. With respect to the amount(s) of refund taxes due on the liability issues resolved herein, said amount(s) will be either later stipulated to by the parties or determined by trial on the merits thereof.

IT IS SO ORDERED.

### *TABLE OF CONTENTS TO STATUTORY APPENDIX*

Relevant portions of the following sections of the I.R.C. and Treasury Regulations are produced in the Statutory Appendix.

| I.R.C. § | Treas.Reg. § |
|---|---|
| §§ 611(a), (b) | §§ 1.611–1(a), (b) |
| § 612 | § 1.612–1(a) |
| § 613(a) | |
| §§ 631(a), (b) & (c) | §§ 1.631–1(d)(3), (e)(1) |
| | §§ 1.861–8(a)(1), (2), & (3) |
| § 991 | |
| § 994 | §§ 1.994–1(c)(3), (6) |
| § 995(a) | |
| § 1504(a) | |

### *STATUTORY APPENDIX*

I.R.C. Sec. 611. ALLOWANCE OF DEDUCTION FOR DEPLETION

**(a) General rule.**—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowances in all cases to be made under regulations prescribed by the Secretary. For purposes of this part, the term "mines" includes deposits of waste or residue, the extraction of ores or minerals from which is treated as mining under section 613(c). In any case in which it is ascertained as a result of operations or of development work that

the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this section for subsequent taxable years shall be based on such revised estimate.

**(b) Special rules.—**

**(1) Leases.—**In the case of a lease, the deduction under this section shall be equitably apportioned between the lessor and the lessee.

\* \* \* \* \* \*

**Treas.Reg. Sec. 1.611–1 ALLOWANCE OF DEDUCTION FOR DEPLETION**

**(a) Depletion of mines, oil and gas wells, other natural deposits, and timber. (1) In general.** Section 611 provides that there shall be allowed as a deduction in computing taxable income in the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion. In the case of standing timber, the depletion allowance shall be computed solely upon the adjusted basis of the property. In the case of other exhaustible natural resources the allowance for depletion shall be computed upon either the adjusted depletion basis of the property (see section 612, relating to cost depletion) or upon a percentage of gross income from the property (see section 613, relating to percentage depletion), whichever results in the greater allowance for depletion for any taxable year. In no case will depletion based upon discovery value be allowed.

\* \* \* \* \* \*

**(b) Economic interest.** (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital.

\* \* \* \* \* \*

(2) No depletion deduction shall be allowed the owner with respect to any timber, coal or domestic iron ore that such owner has disposed of under any form of contract by virtue of which he retains an economic interest in such timber, coal, or iron ore, if such disposal is considered a sale of timber, coal, or domestic iron ore under section 631(b) or (c).

\* \* \* \* \* \*

**I.R.C. Sec. 612. BASIS FOR COST DEPLETION**

Except as otherwise provided in this subchapter, the basis on which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain upon the sale or other disposition of such property.

**Treas.Reg.Sec. 1.612–1 BASIS FOR ALLOWANCE OF COST DEPLETION**

**(a) In general.** The basis upon which the deduction for cost depletion under section 611 is to be allowed in respect of any mineral or timber property is the adjusted basis provided in section 1011 for the purpose of determining gain upon the sale or other disposition of such property except as provided in paragraph (b) of this section. The adjusted basis of such property is the cost or other basis determined under section 1012, relating to the basis of property, adjusted as provided in section 1016, relating to adjustments to basis, and the regulations under such sections. In the case of the sale of a part of such property, the unrecovered basis thereof shall be allocated to the part sold and the part retained.

\* \* \* \* \* \*

**I.R.C. Sec. 613. PERCENTAGE DEPLETION**

**(a) General rule.—**In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent (100 percent in the case of oil and gas properties)

of the taxpayer's taxable income from the property (computed without allowance for depletion). For purposes of the preceding sentence, the allowable deductions taken into account with respect to expenses of mining in computing the taxable income from the property shall be decreased by an amount equal to so much of any gain which (1) is treated under section 1245 (relating to gain from disposition of certain depreciable property) as ordinary income, and (2) is properly allocable to the property. In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.

\* \* \* \* \* \*

I.R.C. Sec. 631. GAIN OR LOSS IN THE CASE OF TIMBER, COAL, OR DOMESTIC IRON ORE.

(a) Election to Consider Cutting as Sale or Exchange.—If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right * *for a period of more than 1 year*) shall be considered as a sale or exchange of such timber cut during such year. If such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the adjusted basis for depletion of such timber in the hands of the taxpayer. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor. If a taxpayer makes an election under this subsection, such election shall apply with respect to all timber which is owned by the taxpayer or which the taxpayer has a contract right to cut and shall be binding on the taxpayer for the taxable year for which the election is made and for all subsequent years, unless the Secretary, on showing of undue hardship, permits the taxpayer to revoke his election; such revocation, however,

shall preclude any further elections under this subsection except with the consent of the Secretary. For purposes of this subsection and subsection (b), the term "timber" includes evergreen trees which are more than 6 years old at the time severed from the roots and are sold for ornamental purposes.

(b) Disposal of Timber With a Retained Economic Interest.—In the case of the disposal of timber held for more than ** *1 year* before such disposal, by the owner thereof under any form or type of contract by virtue of which such owner retains an economic interest in such timber, the difference between the amount realized from the disposal of such timber and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber. In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection. The date of disposal of such timber shall be deemed to be the date such timber is cut, but if payment is made to the owner under the contract before such timber is cut the owner may elect to treat the date of such payment as the date of disposal of such timber. For purposes of this subsection, the term "owner" means any person who owns an interest in such timber, including a sublessor and a holder of a contract to cut timber.

(c) Disposal of Coal or Domestic Iron Ore With a Retained Economic Interest.—In the case of the disposal of coal (including lignite), or iron ore mined in the United States held for more than ** *1 year* before such disposal, by the owner thereof under any form of contract by virtue of which such owner retains an economic interest in such coal or iron ore, the difference between the amount realized from the disposal of such coal or iron ore and the adjusted depletion basis thereof plus the deductions disallowed for the taxable year under section 272 shall be considered as though it were a gain or loss, as the case may be, on the sale of such coal or iron ore. *If for the taxable year of such gain or loss the maximum rate of tax imposed by this chapter on any net capital*

*gain is less than such maximum rate of ordinary income,* such owner shall not be entitled to the allowance for percentage depletion provided in section 613 with respect to such coal or iron ore. This subsection shall not apply to income realized by any owner as a co-adventurer, partner, or principal in the mining of such coal or iron ore, and the word "owner" means any person who owns an economic interest in coal or iron ore in place, including a sublessor. The date of disposal of such coal or iron ore shall be deemed to be the date such coal or iron ore is mined. In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection. This subsection shall have no application, for purposes of applying subchapter G, relating to corporations used to avoid income tax on shareholder (including the determinations of the amount of deductions under section 535(b)(6) or section 545(b)(5)). This subsection shall not apply to any disposal of iron ore or coal—

(1) to a person whose relationship to the person disposing of such iron ore or coal would result in the disallowance of losses under section 267 or 707(b), or

(2) to a person owned or controlled directly or indirectly by the same interests which own or control the person disposing of such iron ore or coal.

[Footnote IRC § 631] * The phrase *"for a period of more than 1 year"* read *"on the first day of such year and for a period of more than 6 months before such cutting"* for property acquired after 6–22–84 and before 1–1–88, under section 1001(c), '84 TRA, P.L. 98–369, 7–18–84.

[Emphases in original.]

Treas.Reg. Sec. 1.631–1 ELECTION TO CONSIDER CUTTING AS SALE OR EXCHANGE

\* \* \* \* \* \*

**(d) Computation of gain or loss under the election.**

\* \* \* \* \* \*

(3) The fair market value as of the beginning of the taxable year of the standing timber cut during the year shall be considered to be the cost of such timber, in lieu of the actual cost or other basis of such timber, for all purposes for which such cost is a necessary factor. See paragraph (e) of this section.

\* \* \* \* \* \*

**(e) Computation of subsequent gain or loss.**

(1) In case the products of the timber are sold after cutting, either in the form of logs or lumber or in the form of manufactured products, the income from such actual sales shall be considered ordinary income. When the election under section 631(a) is in effect, the cost of standing timber cut during the taxable year is determined as if the taxpayer had purchased such timber on the first day of the taxable year. Thus, in determining the cost of the products so sold, the cost of the timber shall be the fair market value on the first day of the taxable year in which the standing timber was cut, in lieu of the actual cost or other basis of such timber.

\* \* \* \* \* \*

Treas.Reg. Sec. 1.861–8 COMPUTATION OF TAXABLE INCOME FROM SOURCES WITHIN THE UNITED STATES AND FROM OTHER SOURCES AND ACTIVITIES

**(a) In General.—(1) Scope.** Sections 861(b) and 863(a) state in general terms how to determine taxable income of a taxpayer from sources within the United States after gross income from sources within the United States has been determined. Sections 862(b) and 863(a) state in general terms how to determine taxable income of a taxpayer from sources without the United States after gross income from sources without the United States has been determined. This section provides specific guidance for applying the cited Code sections by prescribing rules for the allocation and apportionment of expenses, losses, and other deductions (referred to collectively in this section as "deductions") of the taxpayer. The rules contained in this section apply in determining taxable income of the taxpayer from specific

sources and activities under other sections of the Code, referred to in this section as operative sections.

> \* \* \* \* \* \*

(2) **Allocation and apportionment of deductions in general.** A taxpayer to which this section applies is required to allocate deductions to a class of gross income and, then, if necessary to make the determination required by the operative section of the Code, to apportion deductions within the class of gross income between the statutory groupings of gross income (or among the statutory groupings) and the residual group of gross income. Except for deductions, if any, which are not definitely related to gross income (see paragraphs (c)(2) and (e)(9) of this section) and which, therefore, are ratably apportioned to all gross income, all deductions of the taxpayer (except the deductions for personal exemptions enumerated in paragraph (e)(11) of this section) must be so allocated and apportioned. As further detailed below, allocations and apportionments are made on the basis of the factual relationship of deductions to gross income.

(3) **Class of gross income.** For purposes of this section, the gross income to which a specific deduction is definitely related is referred to as a "class of gross income" and may consist of one or more items (or subdivisions of these items) of gross income enumerated in section 61, namely:

 (i) compensation for services, including fees, commissions, and similar items;

 (ii) gross income derived from business;

 (iii) gains derived from dealings in property;

 (iv) interest;

 (v) rents;

 (vi) royalties; ....

> \* \* \* \* \* \*

**I.R.C. Sec. 991. TAXATION OF A DOMESTIC INTERNATIONAL SALES CORPORATION**

For purposes of the taxes imposed by this subtitle upon a DISC (as defined in section 992(a)), a DISC shall not be subject to the taxes imposed by this subtitle except for the tax imposed by chapter 5.

**I.R.C. Sec. 994. INTER–COMPANY PRICING RULES.**

(a) **In General.**—In the case of a sale of export property to a DISC by a person described in section 482, the taxable income of such DISC and such person shall be based upon a transfer price which would allow such DISC to derive taxable income attributable to such sale (regardless of the sales price actually charged) in an amount which does not exceed the greatest of—

 (1) 4 percent of the qualified export receipts on the sale of such property by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts.

 (2) 50 percent of the combined taxable income of such DISC and such person which is attributable to the qualified export receipts on such property derived as the result of a sale by the DISC plus 10 percent of the expert promotion expenses of such DISC attributable to such receipts, or

 (3) taxable income based upon the sale price actually charged (but subject to the rules provided in section 482).

(b) **Rules for Commissions, Rentals, and Marginal Costing.**—The Secretary shall prescribe regulations setting forth—

 (1) rules which are consistent with the rules set forth in subsection (a) for the application of this section in the case of commissions, rentals, and other income, and

 (2) rules for the allocation of expenditures in computing combined taxable income under subsection (a)(2) in those cases where a DISC is seeking to establish or maintain a market for export property.

(c) **Export Promotion Expenses.**—For purposes of this section, the term "export promotion expenses" means those expenses incurred to advance the distribution or sale of export property for use, consumption, or distribution outside of the United States, but does not include income taxes. Such expenses shall also include freight expenses to the extent of 50 percent of the cost of shipping export property aboard airplanes owned

and operated by U.S. persons or ships documented under the laws of the United States in those cases where law or regulations do not require that such property be shipped aboard such airplanes or ships.

Treas.Reg. Sec. 1.994–1 INTER–COMPANY PRICING RULES FOR DISC'S

**(c) Transfer price for sales of export property—(1) In general.** Under this paragraph, rules are prescribed for computing the allowable price for a transfer from a related supplier to a DISC in the case of a sale of export property described in paragraph (b)(1) of this section.

\* \* \* \* \* \*

**(3) The "50–50" combined taxable income method.** Under the combined taxable income method of pricing, the transfer price for a sale by the related supplier to the DISC is the price as a result of which the taxable income derived by the DISC from the sale will not exceed the sum of (i) 50 percent of the combined taxable income (as defined in subparagraph (6) of this paragraph) of the DISC and its related supplier attributable to the qualified export receipts from such sale and (ii) 10 percent of the export promotion expenses (as defined in paragraph (f) of this section) of the DISC attributable to such qualified export receipts.

\* \* \* \* \* \*

**(6) Combined taxable income.** For purposes of this section, the combined taxable income of a DISC and its related supplier from a sale of export property is the excess of the gross receipts (as defined in section 993(f)) of the DISC from such sale over the total costs of the DISC and related supplier which relate to such gross receipts. Gross receipts from a sale do not include interest with respect to the sale. Combined taxable income under this paragraph shall be determined after taking into account under paragraph (e)(2) of this section all adjustments required by section 482 with respect to transactions to which such section is applicable. In determining the gross receipts of the DISC and the total costs of the DISC and related supplier which relate to such gross

receipts, the following rules shall be applied[.] [Rules omitted.]

\* \* \* \* \* \*

I.R.C. Sec. 995. TAXATION OF DISC INCOME TO SHAREHOLDERS

**(a) General Rule.**—A shareholder of a DISC or former DISC shall be subject to taxation on the earnings and profits of a DISC as provided in this chapter, but subject to the modifications of this subpart.

I.R.C. Sec. 1504. DEFINITIONS.

**(a) Affiliated Group Defined.**—For purposes of this subtitle—

**(1) In general.**—The term "affiliated group" means—

(A) 1 or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation, but only if—

(B)(i) the common parent owns directly stock meeting the requirements of paragraph (2) in at least 1 of the other includible corporations, and

(ii) stock meeting the requirements of paragraph (2) in each of the includible corporations (except the common parent) is owned directly by 1 or more of the other includible corporations.

**(2) 80–percent voting and value test.**— The ownership of stock of any corporation meets the requirements of this paragraph if it—

(A) possesses at least 80 percent of the total voting power of the stock of such corporation, and

(B) has a value equal to at least 80 percent of the total value of the stock of such corporation.

**(3) 5 years must elapse before reconsolidation.**—

(A) In general.—If—

(i) a corporation is included (or required to be included) in a consolidated return filed by an affiliated group for a taxable year which includes any period after December 31, 1984, and

(ii) such corporation ceases to be a member of such group in a taxable year beginning after December 31, 1984,

with respect to periods after such cessation, such corporation (and any successor of such corporation) may not be included in any consolidated return filed by the affiliated group (or by another affiliated group with the same common parent or a successor of such common parent) before the 61st month beginning after its first taxable year in which it ceased to be a member of such affiliated group.

(B) Secretary may waive application of subparagraph (a).—The Secretary may waive the application of subparagraph (A) to any corporation for any period subject to such conditions as the Secretary may prescribe.

(4) **Stock not to include certain preferred stock.**—For purposes of this subsection, the term "stock" does not include any stock which—

(A) is not entitled to vote,

(B) is limited and preferred as to dividends and does not participate in corporate growth to any significant extent,

(C) has redemption and liquidation rights which do not exceed the issue price of such stock (except for a reasonable redemption or liquidation premium), and,

(D) is not convertible into another class of stock.

(5) **Regulations.**—The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this subsection, including (but not limited to) regulations—

(A) which treat warrants, obligations convertible into stock, and other similar interests as stock, and stock as not stock,

(B) which treat options to acquire or sell stock as having been exercised,

(C) which provide that the requirements of paragraph (2)(B) shall be treated as met if the affiliated group, in reliance on a good faith determination of value, treated such requirements as met,

(D) which disregard an inadvertent ceasing to meet the requirements of paragraph (2)(B) by reason of changes in relative values of different classes of stock,

(E) which provide that transfers of stock within the group shall not be taken into account in determining whether a corporation ceases to be a member of an affiliated group, and

(F) which disregard changes in voting power to the extent such changes are disproportionate to related changes in value.